**In re QUEEN CITY GRAIN, INC., Debtor.**

**William H. EDER, Jr., Trustee, Plaintiff,**

v.

**QUEEN CITY GRAIN, INC., and Queen City Grain Company, and Thomas J. Geygan, Trustee, and Cargill, Inc., Defendants.**

**Adv. No. 1–83–0468 (Related Case No. 1–82–01273).**

United States Bankruptcy Court, S.D. Ohio, W.D.

June 25, 1985.

Jeffrey Marks, William H. Eder, Jr., interim trustee Queen City Grain, Inc., Cincinnati, Ohio, for plaintiff.

Thomas J. Geygan, Cincinnati, Ohio, for interim trustee Queen City Grain Co.

Gerald L. Baldwin, Cincinnati, Ohio, for Cargill, Inc.

## DECISION ON MOTION OF CARGILL, INC. FOR SUMMARY JUDGMENT

BURTON PERLMAN, Bankruptcy Judge.

This is an adversary proceeding which arises in the above-identified chapter 7 bankruptcy. The adversary proceeding was brought by William H. Eder, Jr., trustee in bankruptcy of the estate of the debtor, Queen City Grain, Inc. (hereafter "Inc.") for the avoidance and recovery of an alleged fraudulent transfer under 11 U.S.C. § 548. While the present debtor was originally named as a defendant in the action, it has subsequently been dismissed voluntarily by plaintiff. Another entity, Queen City Grain Company (hereafter "Company") must be specially indicated in order to avoid confusion, because "Inc."

and "Company" otherwise have identical names, though they are different legal entities. Company is also in bankruptcy, and Thomas J. Geygan, its trustee in bankruptcy, is also named as a defendant. The third remaining defendant is Cargill, Inc., a firm which purchased certain property from Company which is involved in the present proceeding. Cargill, in addition to its answer, filed a cross-claim against Company in which it alleges that Company warranted that it had good and marketable title to the property which is the subject of this action, whereby it seeks indemnification from Company for any liability which it may incur.

In earlier maneuverings in these bankruptcies, plaintiff, Geygan, and the Fifth Third Bank reached a settlement agreement which was approved by the Court. Pursuant to that agreement, plaintiff is not pursuing a money judgment against Geygan herein, though Geygan remains as a defendant. The primary adversaries in this proceeding now are plaintiff and defendant Cargill. Now before us is a motion for summary judgment filed by Cargill. While the evidence is somewhat informally presented on this motion, no question is raised on this account by the parties. Indeed, there seems to be little dispute as to the relevant facts. Company was engaged in the business of the storage, purchase, and sale of grain. It was formed in 1965. All of its stock is owned by James and Geneva Bobb. Company purchased some real estate on Kellogg Avenue near Cincinnati in 1977. The intention was to build a grain elevator at that location. Construction thereon was commenced in 1978 and completed in 1979. Its cost was approximately 1.4 million dollars. Inc. was incorporated about February 1979. Its common non-voting stock is owned by the children of the Bobbs, while Geneva Bobb owns all of the voting preferred stock. Company decided to lease the Kellogg Avenue grain elevator to Inc. A lease made on December 31, 1980 was entered into between the parties, the term thereof being ten (10) years commencing January 1, 1981. The lease provided for an annual rental in the sum of $140,000.00 a year, the rent for any year being due and payable prior to the end of the calendar year. The lease contained no provisions regarding default. The lease contained a provision granting Inc. an option to purchase the premises for 1.4 million dollars, which option could be exercised at any time during the original ten year term of the lease or any extension. Also provided for was a right of first refusal.

In addition to the Kellogg Avenue grain elevator, Company also owned two other grain elevators, one located at Bloomingburg, Ohio and the other at Winchester, Ohio.

From at least as early as mid 1980, Inc. experienced financial difficulties. The year 1981 was a bad crop year. On September 2, 1981 a meeting was held among members of the two family corporations and their attorneys, at which time the precarious financial conditions of both companies was discussed. It was decided at this meeting to sell all of the grain facilities. An appraisal was secured of the Kellogg Avenue installation, and the appraiser stated a fair market value as of September 29, 1981 of 1.9 million dollars. The law firm of Santen, Santen and Hughes, Co., L.P.A. was retained to pursue a sale of the three grain elevators, and Charles M. Meyer of that firm took the lead in approaching prospective purchasers. Among those contacted was Cargill. The first contact with Cargill was in mid-October 1981. Efforts to sell the properties accelerated at the end of 1981 because the principals of Inc. and Company became aware that the grain dealer's license of Inc. was in jeopardy because of Inc.'s poor financial condition. Two oral offers were received on the Kellogg Avenue facility, one for $700,000.00 and the other for 1.1 million dollars. There may have been interest expressed by one or more prospective buyers for the purchase of the Bloomingburg and Winchester elevators for approximately 3.5 million dollars.

The only written offer came from Cargill. Following numerous discussions between the parties, and inspections of the

Kellogg Avenue site by Cargill people, on February 25, 1982 Cargill and Company executed a Letter of Intent for the purchase of all three locations for 4.7 million dollars, and on March 6, 1982, they entered into an agreement to this effect. There was a closing on the transaction on April 15, 1982. At a meeting between Inc. and Company on March 6, 1982 termination of the lease between Inc. and Company was discussed. In a letter to Inc. dated March 6, 1982, Company stated that the lease was terminated for default in rent payments. As a condition to remaining in possession, Company in the letter requested execution of attached "Consent To Termination Of Lease". The "Consent" was executed by Inc. In its negotiations with Cargill, there had been discussions between Company and Cargill about the need to terminate the lease between Company and Inc. Cargill requested that the lease be cancelled and James Bobb informed them that it could be terminated. At the closing on April 15, 1982, Cargill was furnished with documentation evidencing termination of the lease.

**1. Procedural Posture of the Case on Motion for Summary Judgment.**

As we have earlier observed, Company and its trustee in bankruptcy were parties to this litigation. Plaintiff/Trustee has settled his controversy with those entities. The central transaction in this affair was the termination of the lease from Company to Inc. on the Kellogg Avenue grain elevator. Cargill did not participate in that transaction. It is specifically that transaction which is alleged to have been a fraudulent transfer. It would seem that if this matter were to proceed to trial part of plaintiff's burden would be to establish that such transfer was a fraudulent one contrary to 11 U.S.C. § 548. Only if such a determination were to be made, would the provisions of 11 U.S.C. § 550 become relevant, and it is only as to the provisions of § 550 that the present motion is directed.

Cargill has not directed the present motion at the § 548 aspect of the case, other than with respect to the question of whether a "transfer", a requisite for liability

under § 548(a), occurred. Because of this limited attack, we will here consider so far as § 548 is concerned, only whether there was a "transfer". If we conclude that there was a transfer under § 548, it will, for present purposes, be assumed to be fraudulent. The main question with which we will be here dealing is whether, notwithstanding such a fraudulent transfer between the parties directly involved in the transaction, liability for such a transaction can be imposed upon Cargill which was a transferee of Company.

**2. Transfer.**

■ Plaintiff trustee is proceeding here under 11 U.S.C. § 548, entitled "Fraudulent Transfers and Obligations." Called into question on this motion is the following language therein:

(a) The trustee may avoid any transfer of an interest of the debtor in property . . .

It is plaintiff's position in this suit that the termination of the lease between Inc. and Company amounted to a transfer of an interest in property within the meaning of the statute. Cargill on this motion for summary judgment attacks this position asserting that there was no transfer in the circumstances of termination of the lease here involved.

The central evidence relied upon by Cargill is a letter dated March 6, 1982 from Company to Inc. It is signed by James S. Bobb, president of Company, and is addressed to Geneva M. Bobb [his wife], president of Inc. and Carol A. Burgess [their daughter], secretary of Inc. The letter states simply that Inc. is in default for payment of rent and the lease is terminated. The letter goes on to say that Inc. can remain in possession upon payment of rent in advance and execution of a document entitled "Consent To Termination Of Lease." It is the position of Cargill that what was at hand was merely the termination of a lease by reason of default, and as a matter of law there is no transfer involved in such a termination. In effect, Cargill says that termination of an interest in leasehold property by reason of default

is outside the Bankruptcy Code definition of transfer (at 11 U.S.C. § 101(48)) despite the broad language to be found there, that a transfer means every mode of parting with an interest in property.

Extended consideration of the question is unnecessary. There is just no getting away from the fact that upon the termination of Inc.'s lease, there was a "parting with ... an interest in property", for after the termination of the lease Inc. no longer had an interest in the Kellogg Avenue grain elevator facility. It was expressly held in *In re Ferris* 415 F.Supp. 33 (D.C. Okl.1976) to that effect. (While that case applied the Bankruptcy Act, the predecessor of the legislation now in place, we believe it to be valid under the Bankruptcy Code.) Cargill argues against this result with extensive citation of authority intended to demonstrate that upon the termination of a lease for cause, and Cargill extends this proposition to other kinds of contracts, there is a kind of natural death which the cases hold does not amount to a fraudulent conveyance. Where that occurs, says Cargill, there has been no transfer, that is, there was something other than a transfer. We disagree with this analysis by Cargill. While there may have been no fraudulent conveyances in the several cases relied upon by Cargill, there was no decision in them that there was not a transfer.

We come then to the remaining contentions by Cargill on its Motion for Summary Judgment. These all relate to the provisions of 11 U.S.C. § 550. This is an appropriate point at which to reproduce that statute to the extent relevant:

"(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

\*      \*      \*      \*      \*      \*

### 3. Section 550(a)(1).

We hold without extended discussion that Cargill on the facts before us is not an entity within the meaning of either portion of § 550(a)(1). That is, Cargill is not the initial transferee of the transfer which occurred when Company terminated Inc.'s lease. The initial transferee was Company. Nor was Cargill the entity for whose benefit such transfer was made. Neither party offers any authority for use in the interpretation of these words. Each offers obvious arguments for its own purposes.

We exclude Cargill from the category, "entity for whose benefit such transfer was made," because that language clearly identifies another party in the facts of this case. The "entity for whose benefit such transfer was made" was Company. The transfer occurred so that Company could be free to sell the Kellogg Avenue facility. To say that it was for the benefit of Cargill is to rob the language of its specific meaning, and to pervert the obvious thrust of § 550(a)(1). At that point in the statute the intent is to extend liability without the qualifications set out at § 550(b) to those immediately involved in the transfer in question, and the second portion of § 550(a)(1) implements that purpose by closing the loophole of channeling a transfer through a meaningless third party to one who ought to be regarded as the initial transferee.

### 4. Section 550(a)(2).

Cargill argues not only that it does not fall within those entities identified at § 550(a)(1), but that neither can it be categorized as one of those entities identified at § 550(a)(2). We disagree. The initial transferee, as we have seen, was Company. Cargill says that it was neither the immediate nor mediate transferee of Company because the transfer dealt with a leasehold interest which was relinquished to Company and Company did not convey a leasehold

interest to Cargill, but rather conveyed the fee. Cargill's argument in this respect rests upon the proposition that when a leasehold interest comes into the hands of the holder of the fee of real estate, there is a merger and the leasehold interest is extinguished. Apart from some hoary state court precidents, no cases are presented to support or resist this position. We find the argument unsuited to resolution of the controversy in this court which is bound to apply principles of equity rather than narrow rules which are useful in the regulation of affairs concerning interests in real estate. We hold, therefore, that whatever interest it was that was the subject of the transfer here in question, it was conveyed as well from the initial transferee, Company, to Cargill.

### 5. Section 550(b).

On this motion for summary judgment, it is the position of Cargill, the movant, that since it is a transferee of the initial transferee, Company, the plaintiff may not recover from it because he cannot meet the requirements for liability of an "immediate transferee" as required at § 550(b)(1). The statute there provides that:

"(b) the trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided;"

\* \* \* \* \* \*

In his memorandum, plaintiff agrees that the matter in issue under this statutory provision is good faith. This position means that plaintiff does not contest that Cargill took for value, and without knowledge of any voidability of the lease termination, the "transfer avoided". On this motion, and on this segment of the statute, it would therefore appear that the issue is joined on good faith. As will be seen below, this agreement by the parties is subject to question.

In any case, we must deal with the question of good faith, and to do so, we must arrive at a definition for that term as it is used in § 550(b)(1). We note that in the statute it is one of three prerequisites which must be met before a transferee can escape liability. The transferee must (1) take for value, (2) in good faith, and (3) without knowledge of the voidability of the transfer avoided. Clearly the drafters of this statute had a very limited meaning in mind for good faith. We reach this conclusion because in the usual case where good faith is discussed, good faith may be found to be absent where the transferee did not take for value as in *In re Coleman*, 21 B.R. 832, 836 (Bankr.S.D.Tex.1982), or where one is an insider, and thus has knowledge from the outset of the voidability of the transfer under examination, as in *In re Greenbrook Carpet Co., Inc.*, 22 B.R. 86, 90–91 (Bankr.N.D.Ga.1982) and *Burroughs v. Fields*, 546 F.2d 215, 218 (7th Cir.1976). Yet these usual kinds of cases where good faith is said to be in issue involve disability for reasons specifically set out in § 550(b)(1) apart from lack of good faith.

It is therefore not surprising to find that the legislative history tells us that Congress had a very limited scope in mind when it prescribed good faith in § 550(b)(1):

"The phrase 'good faith' in this paragraph is intended to prevent a transferee from whom the trustee could recover from transfering the recoverable property to an innocent transferee, and receiving a retransfer from him, that is 'washing' the transaction through an innocent third party." House Report No. 95–595, 95th Cong., 1st Sess. 375–76, U.S.Code Cong. & Admin.News 1978, 5787, 6332.

That is, for purposes of § 550(b)(1), the legislative intent was limited to closing the door on attempts to immunize a questionable transaction through involvement of a third party.

Our reasoning above makes it clear that we cannot accept the definition of good faith as that term is used in § 550(b)(1) urged by plaintiff, that there is an absence of good faith where a subsequent transferee from the initial transferee knows of the transferor's unfavorable financial con-

dition, or where the initial transferee was an insider of the transferor, for which plaintiff relies on *In re Greenbrook Carpet Co., Inc., supra.*

■ Utilizing the limited definition of good faith for purposes of § 550(b)(1) at which we have arrived, the record before us does not even suggest facts which would tend to show an absence of good faith of Cargill. In dealing with this question we bear in mind that good faith is to be determined on a case by case basis. *In re Coleman*, 21 B.R. 832, 836 (Bankr.S.D. Tex.1982); *In re Butcher*, 45 B.R. 736, 740 (Bankr.E.D.Tenn.1985).

■ Cargill asserts on its motion for summary judgment that the record affirmatively shows good faith in its acquisition of the properties sold to it by company, we agree that it does. The following facts are not disputed. The genesis of the transaction arose in financial difficulties of Company and Inc. These companies found themselves being unprofitable in the grain business in the time and place in which they were operating. Matters had gotten to a stage where there was a danger that Inc. would lose its grain dealer license because of its unprofitability. It was these financial difficulties which led Company to offer its properties for sale. Company retained the services of Meyer, his job being the placing of the properties of Company on the market. It was through the marketing efforts of Meyer that contact between Company and Cargill was made, and that the sale from Company to Cargill occurred. No evidence raises a question of fact to dispute that dealing between Company and Cargill was at arms length. There is simply no issue of fact regarding good faith, as that term is used in § 550(b)(1).

We commented at the outset of this section of our decision, that plaintiff's concurrence that the only issue with respect to § 550(b)(1) is good faith, is questionable. The discussion by the parties has little to do with the limited definition of good faith at which we have arrived. Plaintiff's remarks are appropriate not to § 550(b)(1) good faith, but to the third requirement of § 550(b)(1), that the transferee be "without knowledge of the voidability of the transfer" in question. As we have seen, in contexts other than § 550(b), the third element of that section required to establish liability—"knowledge of the voidability of the transfer avoided"—is a visage of good faith. On this motion, the parties have made arguments regarding good faith which really are addressed to this third element. For that reason we do not hesitate to complete consideration of § 550(b) on the basis of what has been submitted by the parties.

Cargill argues that there is clear evidence establishing that it was without knowledge of the voidability of the transfer. It is in the unenviable position on this motion, of having to establish a negative in order to succeed. It is to be noted that the statute expressly requires "knowledge" by the transferee. The argument by plaintiff, therefore, that it is enough for liability to show that the transferee "should have known" the relevant facts, relying on *In re Messenger*, 32 F.Supp. 490, 494 (E.D.Pa. 1940) must be rejected, for the statute expressly requires actual knowledge.

The transfer in question, as we have seen, is the cancellation of the lease of the Kellogg Avenue facility. It is fairly deducible from what is before us that it is plaintiff's position that that transfer is subject to being avoided on the grounds appearing in § 548(a)(2)(A), that Inc. received less than a reasonably equivalent value in exchange for that plus the requirement of § 548(a)(2)(B)(i), that debtor was insolvent at the time of the transfer. To defeat the present motion, there must be a genuine issue of fact as to whether Cargill had knowledge of these two elements. Particularly, nothing appears of record which contradicts Cargill's evidence that it did not have knowledge that Inc. received less than a reasonably equivalent value (if, indeed, Inc. did receive less than a reasonably equivalent value) upon the cancellation of the lease.

What is clear and undisputed is that the factual setting for the transaction was as

recounted above at p. 728. In addition, Cargill prior to the closing of the sale to it from Company, knew that Inc. was in possession of the premises under a lease, and that the lease had to be terminated prior to the sale. The lease was terminated by Company by a letter to Inc. dated March 6, 1982, for default in rent payments. Cargill was supplied this documentation in fulfillment of its requirement that the lease be terminated and accepted it as compliance. Possession was surrendered by Inc. and Cargill went into possession after the closing. Thus, Inc.'s lease was terminated for nonpayment of rent, and it left the premises, surely a common and well understood basis for lease termination. We conclude from the foregoing that Cargill has prima facie established that the third element of § 550(b) is not present.

Plaintiff says, however, that there is an issue of fact created about whether Cargill had knowledge that Inc. received less than a reasonably equivalent value for the lease. Sifting through the assertions by plaintiff which bear on this question, we find that it relies on the following to contend that an issue of fact exists:

> "... Cargill indeed reviewed the lease and, therefore, was aware of Inc.'s and Company's rights thereunder, including the low rental, the favorable purchase option, and the absence of any provision governing rights upon default. Cargill knew of the familial relationship between Inc. and Company so that it was surely aware of the possibility that the cancellation of the lease may not have been done on an arm's length basis." Plaintiff's Memorandum in Opposition, pp. 18–19.

There is nothing in such evidence which, even if true, raises an issue of fact about the state of Cargill's knowledge as to voidability of the cancellation of the lease. While it is basic in applying F.R.Civ.P. 56, the summary judgment rule, that we may not resolve issues of fact, we find that there is no issue of fact that Cargill did not have knowledge of any voidability of the cancellation of the lease.

In light of the foregoing discussion, we conclude that Cargill is entitled to summary judgment and its motion will be granted. The complaint against Cargill will be dismissed.