In re E–TRON CORPORATION, Debtor.

David P. MICHAELS, Trustee, Plaintiff,

v.

NATIONAL BANK OF SUSSEX COUNTY, Defendant.

Bankruptcy No. 86–04126.
Adv. No. 90–3025 SAS.

United States Bankruptcy Court,
D. New Jersey.

June 4, 1992.

---

James F. Keegan, Bendit, Weinstock & Sharbaugh, West Orange, N.J., for David P. Michaels, Trustee, plaintiff.

Ira M. Levee, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, N.J., for Nat. Bank of Sussex County, defendant.

## MEMORANDUM OPINION

STEPHEN A. STRIPP, Bankruptcy Judge.

On July 3, 1986, E–Tron Corporation ("E–Tron" or "debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101 *et seq.* (hereinafter "Bankruptcy Code" or "Code"). The case was converted to chapter 7 on May 11, 1988. On May 12, 1988, David P. Michaels was appointed as trustee. He filed this adversary proceeding on January 22, 1990 to expunge the claim of National Bank of Sussex County ("NBSC" or "Bank") and to avoid several allegedly preferential and fraudulent transfers made by E–Tron to NBSC.

The trustee filed this motion on September 16, 1991, returnable October 15, 1991, seeking summary judgment dismissing a counterclaim filed by NBSC, which sought *nunc pro tunc* approval of a loan by NBSC to E–Tron for a purchase of assets out of the ordinary course of business. The trustee's motion also seeks to renew portions of a previous motion for summary judgment heard June 4, 1991, which had been denied without prejudice. NBSC filed a cross-motion for summary judgment based on the argument that the trustee's cause of action is barred by the statute of limitations in Code section 549(d)(1).

This court has subject matter jurisdiction under 28 U.S.C. §§ 1334 and 151. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (F), (G), (H) and (O). For the reasons which follow, the trustee's motion for summary judgment is granted in part and denied in part, and NBSC's motion is denied. This shall constitute the court's findings of fact and conclusions of law.

## I.

## FINDINGS OF FACT

The following material facts are undisputed.

E–Tron and NBSC commenced a lending relationship a few months prior to the filing of E–Tron's bankruptcy petition on July 3, 1986. Prior to the loan in question, E–Tron received bankruptcy court approval for two postpetition credit transactions with NBSC. Specifically, E–Tron received the benefit of a letter of credit in the amount of $155,280 issued to Onan Corporation on October 15, 1986. *See* Affidavit of Sherri Davis Fowler in Support of Motion for Summary Judgment on the Counterclaim and for Partial Summary Judgment on the Complaint, Exhibit E, at 2. On February 26, 1987, NBSC also issued a $200,000 line of credit to E–Tron secured by an assignment of accounts receivable and certain contract rights. These transactions were authorized by this court on March 4, 1987 and March 17, 1987, respectively. *See* Trustee's Brief in Support, at 5.

The subject of this adversary proceeding is a loan made by NBSC to E–Tron on September 23, 1987 for which court approval was not obtained. On that date, NBSC loaned $500,000 to the debtor, purportedly for the purchase of machinery and equipment owned by a company by the name of Jamaica Plastics. NBSC has no formal commitment letter in its records for the loan which it made to E–Tron to finance this purchase. *See* Exhibit I to 1/17/90 Complaint. A promissory note was exe-

cuted, however, and NBSC took a security interest in the machinery and equipment. The loan was authorized by NBSC's loan committee based solely on the representations of John Sweet, a Vice President of NBSC. *See* Exhibit C, Affidavit of Counsel, June 23, 1988 claim to Fidelity Deposit Company of Maryland, at 3.

The proceeds from the unauthorized $500,000 loan were disbursed by NBSC in six cashier's checks all executed by John Sweet. The first check in the amount of $200,000 was deposited by E–Tron in its name in a certificate of deposit at NBSC. Two checks totaling $250,000 were made out to E–Tron and Jamaica Plastics to finance the purchase. The fourth check was made out to NBSC in the amount of $10,000 to pay for the "points" charged by the Bank to obtain the $500,000 loan. The fifth check totaled $34,116.80 and was applied against the outstanding balance of the $200,000 revolving stand-by letter of credit which was previously authorized by the court. The sixth check made out to E–Tron represented the $5,883.20 balance of the unused proceeds of the loan. The record to this point does not indicate whether E–Tron received all of the loan proceeds and whether Jamaica Plastics was paid for the equipment in question. The trustee alleges, but has not documented, that part of the loan proceeds was diverted by Sweet and was never used to acquire the assets of Jamaica Plastics. The trustee indicates, however, that E–Tron obtained an interest in some of Jamaica Plastics manufacturing equipment, subject to a landlord's lien. Ultimately, this equipment was abandoned by the trustee under a settlement with the landlord. The landlord waived all claims against the trustee and the debtor's estate. *See* Consent Order of 3/27/89, Document # 382, E–Tron Corporation, main bankruptcy case (86–04126), (confirming abandonment of property and waiver of claim against estate as to Goldsul Partners). Before this occurred, however, the debtor incurred expenses and attorney's fees in attempting to sell the equipment. Exclusive of attorney's fees, debtor's general ledger shows expenditures related to Jamaica Plastics totaling $22,685.80. *See* Trustee's Brief in Opposition to Cross–Motion to Dismiss, at 4 n. 3.

From October through December of 1987, E–Tron made payments on the outstanding loan balance according to the loan payment schedule. On November 27, 1987, Sweet caused NBSC to unilaterally set off the $200,000 certificate of deposit which E–Tron had purchased with part of the loan proceeds and applied it against the $500,000 loan balance. On December 9, 1987 NBSC terminated Sweet's employment because of various improper acts, including diversion of part of the proceeds of the loan in question to his personal use.

On January 11, 1988, NBSC filed a Criminal Referral Form with the Office of the Comptroller of the Currency, reporting certain activities of John Sweet, including his role in the September 23, 1987 loan transaction with E–Tron. As a result of an apparent internal investigation and discovery of other questionable loans, NBSC later filed an Amended Criminal Referral Form with the Office of the Comptroller of the Currency, the FBI and the Office of the United States Attorney. *See* Supplemental Certification of Kenneth Spriggs, Vice President of NBSC, dated December 3, 1991, at 2. NBSC did not notify the bankruptcy court or E–Tron's trustee of the criminal referral or the ongoing investigation. NBSC asserts, however, that "[e]xcept as was necessary to protect the integrity of an investigation by the FBI and to protect its depositors, the Bank has not intentionally concealed information from the trustee herein." *Id.* at 3.

Subsequent to the conversion of the case to chapter 7 and appointment of the trustee, NBSC filed a proof of claim against the debtor's estate in the amount of $537,770.58. The trustee filed this adversary proceeding on January 22, 1990 to expunge the proof of claim of NBSC, and to avoid several allegedly preferential and fraudulent transfers made by the debtor to NBSC. These transfers related to the on-going business of the debtor and the September 23, 1987 loan.

By motion heard June 4, 1991, the trustee sought partial summary judgment on

the complaint, and an order requiring NBSC to provide specific discovery. By order of July 1, 1991, the court directed NBSC to provide specific documents to the trustee and granted partial summary judgment on four issues. The court determined that the debtor's purchase of the assets of Jamaica Plastics and the September 23, 1987 loan transaction were not in the ordinary course of the debtor's business. The court also determined that bankruptcy court approval was therefore required for both the loan transaction and the purchase. 11 U.S.C. §§ 363(b) and 364. The court held that court approval was also required to grant NBSC a security interest in the Jamaica Plastics equipment and machinery. The court also allowed NBSC to file a counterclaim seeking *nunc pro tunc* approval of the loan transaction.

NBSC filed the counterclaim on June 12, 1991 and it was answered by the trustee on July 1, 1991. The trustee filed the subject motion for summary judgment on September 16, 1991. The motion essentially seeks denial of the application for *nunc pro tunc* approval of the September 23, 1987 loan transaction, turnover by NBSC of the $200,000 certificate of deposit (# 36941) which NBSC unilaterally set off, turnover by NBSC of the proceeds of bank checks (# 151472 & # 151473) with interest from September 23, 1987, turnover by NBSC of all payments of principal and interest made by the debtor against the unauthorized September 23, 1987 loan, and expungement of NBSC's proof of claim.

NBSC filed a cross-motion for summary judgment dismissing the complaint on the grounds that the trustee's cause of action was time-barred because of the statute of limitations contained in section 549(d)(1).

## II.

### STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, states that summary judgment shall be granted to the moving party if the court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c)). The *Anderson* Court stated that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

■ On a motion for summary judgment, the movant initially bears the burden of showing that there are no genuine issues of material fact. Fed.R.Civ.P. 56(c). Federal Rule 56(e), however, requires an adverse party to affirmatively set forth specific facts showing that there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 247, 106 S.Ct. at 2509–10. A party cannot withstand summary judgment merely by "presenting conclusory allegations or denials; the existence of specific material evidentiary facts must be shown." *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829, 860 (3d Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). Evidence which relates to collateral issues that do not pertain to the core of the summary judgment motion will not serve to defeat the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

A summary judgment motion attempts to demonstrate that no genuine factual issue exists despite the fact that one may be stated on the face of the pleadings. 9 *Collier on Bankruptcy,* ¶ 7056.06, at 7056–5 (15th Ed.1991) (citing 6 *Moore's Federal Practice,* ¶ 56.11, at 56–198–99 (2d ed. 1990)). The court must examine the evidence in a light most beneficial to the nonmoving party. *See In re Holzinger,* 89 B.R. 529, 530 (Bankr.E.D.Pa.1988). Any

reservation as to the existence of issues of fact will be determined against the moving party. *See In re Cantin,* 114 B.R. 339, 340 (Bankr.D.Mass.1990).

## III.

### STATUTE OF LIMITATIONS DEFENSE

■ The first issue is whether Code section 549(d)(1),[1] the statute of limitations for causes of action to avoid unauthorized post-petition transfers, precludes the trustee's cause of action to recover all payments to and setoffs by NBSC to reduce the balance due on the September 23, 1987 loan.[2] NBSC has raised the affirmative defense that the trustee's cause of action is time-barred because of the statute of limitations contained in section 549(d)(1). NBSC contends that it advised the debtor as early as December 16, 1987 of the transfer which occurred on November 27, 1987. *See* Exhibit E, Defendant's Brief in Support of Cross–Motion. On May 12, 1988, David P. Michaels accepted appointment as trustee for the liquidation of E–Tron. The adversary proceeding was filed on January 22, 1990. The statute of limitation contained in section 549(d)(1) begins to run from the time a transfer occurs, not from the date of a trustee's appointment. *In re 31–33 Corp.,* 100 B.R. 744 (Bankr.E.D.Pa.1989). Accordingly, the defendant moves for dismissal of the adversary proceeding for failure to institute the cause of action within the prescribed two-year period pursuant to section 549(d)(1).

### A.

### TRANSFERS IN VIOLATION OF THE AUTOMATIC STAY ARE SUBJECT TO § 549 AND ITS STATUTE OF LIMITATIONS

In its Brief in Opposition to the Defendant's Cross–Motion, the trustee sets forth two arguments to rebut the statute of limitation defense. The trustee's primary argument asserts that the limitations period of section 549(d)(1) is not applicable because the defendant's actions concerning E–Tron's certificate of deposit were a direct violation of the automatic stay. The trustee relies on *In re R & L Cartage & Sons, Inc.,* 118 B.R. 646 (Bankr.N.D.Ill. 1990) and *In re Garcia,* 109 B.R. 335 (N.D.Ill.1989).

In *R & L Cartage,* a creditor had repossessed and sold property which was determined to be property of the estate during the pendency of the debtor's chapter 11 case. The creditor had not obtained relief from the automatic stay. The *R & L Cartage* court held in pertinent part:

> [W]here a creditor acts in direct violation of the automatic stay of § 362, it may not seek refuge behind § 549(d) when it is eventually called upon to account for its misconduct. There is no statute of limitations upon actions which seek to remedy violations of the automatic stay.

*Id.* at 651.

In *Garcia,* a municipality violated the automatic stay through a postpetition sale for delinquent taxes. The court held in pertinent part:

> Acts in violation of the automatic stay imposed by § 362(a) are void *ab initio.* § 549(d)'s restriction on the time period within which a trustee may avoid post-petition transfers does not apply to the trustee's challenge of actions specifically prohibited by § 362(a).

*Id.* at 340.

■ The automatic stay is applicable to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Property

---

1. Section 549(d) provides in full:

   (d) An action of proceeding under this section may not be commenced after the earlier of—
   (1) two years after the date of the transfer sought to be avoided; or
   (2) the time the case is closed or dismissed.

2. Section 549(a) provides in full:

   (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
   (1) that occurs after the commencement of the case; and
   (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
   (B) that is not authorized under this title or by the court.

of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). *See also In re Lite Coal Mining Co.*, 122 B.R. 692, 694 (Bankr. N.D.W.Va.1990). The $200,000. certificate of deposit which E–Tron purchased from NBSC with part of the proceeds from the unauthorized postpetition loan was property of the estate. NBSC's setoff of the certificate of deposit against E–Tron's debt to NBSC from the unauthorized postpetition loan therefore violated the automatic stay. Transfers in violation of the automatic stay are void, rather than voidable. *Maritime Electric Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991); *In re Ward*, 837 F.2d 124, 126 (3d Cir.1988).

█ It does not follow, however, that section 549 and its statute of limitations are inapplicable. Section 549(a) provides that a trustee may avoid certain unauthorized postpetition transfers of property of the estate. The term "transfer" is defined in section 101(54) as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...."

> Congress intended this definition to be all-inclusive and as broad as possible to encompass any surrender of an interest in property, whether the transfer is of legal title or of possession, custody or control. Senate Report No. 95–989, 95th Cong. 2d Sess. 26–27 (1978); House Rep. No. 95–595, 95th Cong. 1st Sess. 373 (1977), U.S.Code Cong. & Admin.News, 1978 p. 5787; See *In re Wey*, 78 B.R. 892, 894 (C.D.Ill.1987); *In Re Lemley Estate Business Trust*, 65 B.R. 185, 189 (Bkrtcy.N.D.Tex., 1986); *In Re Queen City Grain, Inc.*, 51 B.R. 722, 726 (Bkrtcy.S.D.Ohio, 1985).

*In re Carmel*, 92 B.R. 778, 780 (Bankr. N.D.Ill.1988). A seizure of estate property in violation of the automatic stay is therefore an involuntary transfer of a possessory interest in such property under sections 101(54) and 549(a). The court declines to follow *R & L Cartage* and *Garcia* to the extent that those cases reached a contrary conclusion. Their reasoning cannot be satisfactorily reconciled with the language of sections 101(54) and 549(a), which does not leave room for the exception which those cases would create.

Since section 549 is applicable, so is the statute of limitations in § 549(d)(1).

## B.

## EQUITABLE TOLLING CAN EXTEND THE STATUTE OF LIMITATIONS IN § 549(d)(1)

As an alternative response to the cross-motion for summary judgment, the trustee invokes the equitable tolling doctrine, which is "read into every federal statute of limitations." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946).

█ Accordingly, the statute of limitations of section 549 can be equitably tolled where the postpetition transfers the trustee seeks to avoid have been concealed. *In re Bookout Holsteins, Inc.*, 100 B.R. 427 (Bankr.N.D.Ind.1989). The *Bookout Holsteins* court specifically noted that "[s]ilence on the part of the defendant may constitute concealment where there is a duty to speak and disclose material information." *Id.* at 429. *See also In re McGoldrick*, 117 B.R. 554 (Bankr.E.D.Cal. 1990) (holding that the two-year action statute of limitation on avoidance actions brought by the trustee was subject to equitable tolling where the trustee has made reasonable and diligent inquiry and relevant facts were concealed from him).

█ The trustee contends that the defendant concealed material information concerning its proof of claim and the September 23, 1987 loan transaction, thus equitably tolling the statute of limitations of section 549(d)(1). The trustee alleges acts of concealment which, if proven, could lead to a determination that the section 549(d) statute of limitations has been tolled. The defendant, however, alleges that no active or intentional concealment occurred. The defendant alleges that the debtor was

aware of the cancellation of the certificate of deposit as early as December 16, 1987 (more than two years before the complaint was filed) by a letter from NBSC, dated December 16, 1987. *See* Defendant's Brief in Support of Cross–Motion to Dismiss, Exhibit E. The trustee counters that the letter did not reveal that the cancellation was unauthorized and that one of NBSC's officers acted illegally. In addition, NBSC did not inform the trustee or the court of the illegal actions of its vice president in connection with the loan until it was compelled by the court to do so. Thus, there is a genuine issue of material fact as to whether any active or passive concealment took place. Accordingly, NBSC's cross-motion for summary judgment is denied and the parties should be prepared to produce proofs on the issue of equitable tolling at trial. The trial briefs of the parties should address, *inter alia*, whether NBSC had a duty to inform the trustee and this court of the wrongful acts of one of the Bank's officers and the effect of breach of such a duty on the doctrine of equitable tolling.

## IV.

### NUNC PRO TUNC APPROVAL

As a result of the trustee's first motion for summary judgment, this court ruled that the September 23, 1987 loan transaction and the purchase of Jamaica Plastics' assets were not in the ordinary course of business and therefore required court approval. The court allowed NBSC to file a counterclaim seeking *nunc pro tunc* approval of the loan.

The seminal case of *In re American Cooler Co.*, 125 F.2d 496 (2d Cir.1942), set forth the following test for determination of an application for *nunc pro tunc* approval of an unauthorized loan:

> We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by continuation of the business made possible by the loan. He should also take into account, as bearing

on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record. We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender will attempt to make it serve as a substitute for proper authorization.

*Id.* at 497. *Nunc pro tunc* approval is within the discretion of the court. *Matter of Alafia Land Development Corp.*, 40 B.R. 1, 4 (Bankr.M.D.Fla.1984).

The United States Court of Appeals for the Third Circuit has not addressed the standards for *nunc pro tunc* approval of a loan out of the ordinary course of business under Code section 364. That court has, however, held that *nunc pro tunc* approval of employment of a professional person under Code sections 327(a) or 1103(a) should be limited to cases where extraordinary circumstances are present. *Matter of Arkansas Co., Inc.*, 798 F.2d 645 (3d Cir. 1986); *In re F/S Airlease, II, Inc.*, 844 F.2d 99 (3d Cir.1988) *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). The court noted in *Arkansas* that the prophylactic purpose underlying the statutory requirement of prior approval was to protect the estate by ensuring in advance that such employment is necessary, and that the professional in question has the requisite ability and integrity. *Arkansas, supra*, 798 F.2d at 648.

Other bankruptcy courts in this Circuit have opined that in light of *Arkansas* and *Airlease*, the Court of Appeals for the Third Circuit is likely to use a similar standard when it addresses *nunc pro tunc* approval of loans under Code section 364. *In re Massetti,* 95 B.R. 360, 364 (Bankr. E.D.Pa.1989); *In re City Wide Press, Inc.*, 102 B.R. 431, 436 (Bankr.E.D.Pa.1989). This court agrees with that conclusion. The importance to the estate of taking a loan out of the ordinary course of business will generally be at least as great as the

importance of employment of professionals. If *nunc pro tunc* approval of such employment should be limited to extraordinary circumstances, it follows that *nunc pro tunc* approval of such loans should be limited to similarly extraordinary circumstances.

██ Both *Arkansas* and *American Cooler* hold that *nunc pro tunc* approval should not be granted unless the court determines, *inter alia*, that the transaction would have been authorized if a timely application had been made. *Arkansas, supra,* 798 F.2d at 650 and *American Cooler, supra,* 125 F.2d at 497. In this case, the court determines that the loan would not have been authorized even if timely application had been made, for the following reasons.

The court would not have approved the loan unless it would also have approved the purchase for which the loan was ostensibly intended, and the court would not have approved the purchase without proof that it would benefit the bankruptcy estate. The only evidence which NBSC has offered on these motions regarding prospective benefit to the estate is a letter dated December 31, 1987 from Robert M. Thomas, who was President of E–Tron at the time of the loan and purchase in question, to Kenneth Spriggs, who was then Executive Vice President of NBSC. *See* NBSC's Brief in Support of Cross–Motion filed November 1, 1991, Exhibit D. That letter states that the reason for the purchase of Jamaica Plastics' assets was to enable E–Tron to fill a purchase order by which E–Tron "would have profited $10,000. per month" for some unspecified period. No evidence is offered as to the total projected profit, or how NBSC would prove it. This court would not have accepted Mr. Thomas's conclusory statement as sufficient to prove benefit to the estate at the time of the transactions, and it will not do so now. Such proofs would have to be particularly thorough and compelling in light of the fact that it would be highly unusual to permit a debtor in chapter 11 to purchase substantially all of another company's assets. As evidenced by the fact that only approximately ten percent of chapter 11 cases are successful, chapter 11 debtors typically have all they can handle in attempting to reorganize their own companies without assuming the added risk and complexity incumbent upon purchasing the assets of another company while the purchaser is in the middle of a reorganization case.

Moreover, no evidence is offered that the debtor did make a profit or otherwise benefit from the purchase. In fact, the evidence is to the contrary. According to the letter of intent between E–Tron and Jamaica Plastics at Exhibit A to the Bank's brief, Jamaica Plastics represented that there would be no liens on the machinery at the time of the transfer. However, as previously noted, the assets were in fact subject to a landlord's lien when transferred. E–Tron incurred costs, exclusive of attorney's fees, of approximately $23,000 in attempting to sell the Jamaica Plastics equipment after it was purchased. The estate was damaged to that extent. *American Cooler* counsels that the court should not grant *nunc pro tunc* approval of an unauthorized loan unless it is reasonably persuaded that the creditors have not been harmed by the continuation of the business made possible by the loan. No evidence is offered on these motions to controvert the trustee's proffer of evidence that the estate was harmed by these transactions, and the court therefore concludes that the estate and its creditors were harmed.

██ NBSC alleges that it was misled by debtor's counsel into believing that court approval was unnecessary. Debtor's counsel and the trustee deny that allegation, and the trustee notes that the debtor had obtained prior court approval of two prior loans from NBSC in this case. Even if the debtor's attorney had stated to the debtor or NBSC that court approval was unnecessary, which seems doubtful, NBSC would not have been justified in relying on such representations in light of Code sections 363(b) and 364 and the fact that court approval for loans had been sought and obtained twice before. In addition, NBSC would be obligated to consult its own attorney regarding the need for court approval

and arrive at its own conclusion regarding the matter, and there is absolutely no basis whatsoever on the facts or the law for any conclusion that court approval was unnecessary. Any belief that approval is unnecessary or that it had been obtained must be reasonable and in good faith. *See Matter of Alafia Land Development Corp., supra.* There are no facts which NBSC could prove based on its papers on these motions which would lead this court to conclude that NBSC reasonably believed in good faith that court approval of the loan for the purchase of Jamaica Plastics' assets was unnecessary.

NBSC argues that if it does not receive *nunc pro tunc* approval and the trustee is permitted to recover the setoff and other payments on the loan, the prejudice to NBSC will outweigh any prejudice to the bankruptcy estate and its creditors. In analogous circumstances, the Court of Appeals for the Third Circuit held as follows in *Arkansas:*

> We thus hold that *nunc pro tunc* approval should be limited to cases where extraordinary circumstances are present. Otherwise the bankruptcy court may be overly inclined to grant such approval influenced by claims of hardship for work already performed. In this respect we part company with those courts that have suggested that inadvertence or oversight of counsel may constitute excusable neglect sufficient to relieve the parties of the consequences of their inaction. [citations omitted]. We agree instead with the approach of those courts that limit the grant of retroactive approval to cases where prior approval would have been appropriate and the delay in seeking approval was due to hardship beyond the professional's control. [citations omitted]. While this may seem to be a harsh rule, a more lenient approach would reward laxity by counsel and might encourage circumvention of the statutory requirement.

*Id.* at 649–50.

■■■■■■ Cases of unauthorized employment are analogous to cases of unauthorized loans in that in both situations, some-

thing of value has been provided to the estate for which compensation or reimbursement is not granted for statutory and policy reasons, even though the result may seem harsh. This court sees no reason why a bank which has made an unauthorized loan should receive better treatment than a professional who has rendered unauthorized services. In both situations, applying *Arkansas,* the court is not to grant *nunc pro tunc* approval unless the delay in seeking approval was due to hardship beyond the applicant's control. It is clear in this case that NBSC knew that E–Tron was in bankruptcy and that two prior credit transactions for substantially smaller amounts required court approval. The delay in seeking such approval here was not due to any hardship beyond NBSC's control. It appears, rather, that it was due to the larcenous intentions or negligence of NBSC's officer, John Sweet. That is a matter for NBSC to take up with its bonding company, as it already has done. It does not, however, constitute a hardship beyond NBSC's control within the meaning of the *Arkansas* test. Moreover, the fact that NBSC then effected a setoff of the certificate of deposit without court approval does not put it in any better position than it would have been in without the setoff, since court approval of that action was clearly required under Code section 362(a) as well.

Since the requirements for *nunc pro tunc* approval of an unauthorized loan are in the conjunctive, any one of the foregoing conclusions would be sufficient to deny such approval. Taken together, they provide more than is necessary for the court to conclude that there are no genuine issues of material fact preventing the determination that the loan would not have been approved if timely application had been made because the purchase would not have been approved, and the delay in seeking such approval was not due to any hardship beyond NBSC's control. There are no extraordinary circumstances here which warrant such approval. The trustee's motion to dismiss NBSC's counterclaim is therefore granted.

## V.

### REMAINING ISSUES

To summarize, the court has heretofore held that the loan by NBSC to the debtor for the purchase of Jamaica Plastics' assets was not in the ordinary course of the debtor's business, and that prior court approval of those transactions was therefore required. The court now holds that such approval would not have been granted if timely application had been made, and the application for *nunc pro tunc* approval is therefore denied.

The court has also held, however, that the trustee's complaint in this case to avoid an unauthorized postpetition setoff by the Bank and for other relief is subject to the statute of limitations in Code section 549(d)(1). Since the complaint in this adversary proceeding was not filed within two years of the transfers sought to be avoided, the cause of action will be barred by the statute of limitations unless the doctrine of equitable tolling applies. Genuine issues of material fact exist as to the elements for application of that doctrine in this case.

If the trustee meets his burden of proving that equitable tolling applies, NBSC's claim against the debtor will presumably be relegated to unsecured status. *In re John Deskins Pic Pac, Inc.*, 59 B.R. 809 (Bankr. W.D.Va.1986); 2 *Collier's on Bankruptcy,* ¶ 364.03, at 364–8 (15th Ed.1985). *See also In re Sherwood Square Assoc.*, 107 B.R. 872, 875 (Bankr.D.Md.1989). *But see In re Alafia Land Development Corp., supra* (holding that lender is not even entitled to unsecured status except in extraordinary circumstances; such circumstances were found to be present).

To the extent that the trustee proves that NBSC received payment on such claim through setoff or other means which were not authorized by the court or the Code, the trustee will be able to obtain judgment against NBSC. The trustee's motion for summary judgment compelling turnover of the funds which were the subject of the setoff, and for any other relief not expressly granted above, is denied.

The attorney for the trustee is to submit an order under Rule 4 of the Local Rules of Bankruptcy Practice. In addition, the attorneys are to request a telephone conference with the court to schedule further proceedings after they have conferred with their clients regarding the outcome of these motions.