In re **DURSO SUPERMARKETS, INC., Debtor.**

**DURSO SUPERMARKETS, INC., Plaintiff,**

v.

**Florence B. D'URSO, Trustee, as Assignee of Florence B. D'Urso, Executrix of the Estate of Camillo J. D'Urso, Deceased, Defendant.**

Bankruptcy No. 92 B 43864 (PBA). Adv. No. 93–9475A (JHG).

United States Bankruptcy Court, S.D. New York.

March 20, 1996.

Cadwalader, Wickersham & Taft, New York City by H. Peter Haveles, Jr., Florence I. Barber, Manal Zakhary Khalil, for Debtor.

Schlam, Stone & Dolan, New York City, and Law Offices of Burton S. Weston, Manhasset, NY, and Stephan B. Gleich & Associates, Great Neck, NY (Richard H. Dolan, Burton S. Weston, of Counsel), for Defendant.

## DECISION AFTER TRIAL

JEFFRY H. GALLET, Bankruptcy Judge.

### I. INTRODUCTION

Before me[1] is yet another round in the continuing conflict between the Plaintiff, Durso Supermarkets Inc., ("DSI") and the Defendant, Florence D'Urso ("Mrs. D'Urso"). Prior to their stop in my court, these parties have litigated, and continue to litigate, in various state and federal trial and appellate courts. There is no reason to believe that this is their last field of legal combat.

1. Subject matter jurisdiction arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(H).

DSI claims that a certain lease termination ("Lease Termination"), pursuant to a "cross-default" provision, constitutes a fraudulent conveyance.[2] It does not seek to be restored to possession of the properties, rather, it seeks to recover the value of the leasehold ("Leasehold" or "Lease"), including the "enterprise value" lost because it could not continue to do business in the previously leased premises ("Leased Premises").

DSI also claims that it is entitled to a payment or credit equal to the value of the inventory and fixtures it left in the Leased Premises, when they were returned to Mrs. D'Urso.[3]

The Lease covered three parcels of real property, with free standing commercial buildings, located at Fteley Avenue in the Bronx, New York (the "Fteley Property" or "Fteley Store"); Lefferts Boulevard in Queens, New York (the "Lefferts Property" or "Lefferts Store"); and Merrick Road in Freeport, Long Island (the "Freeport Property" or "Freeport Store") (collectively the "Leased Properties"), in which DSI operated supermarkets. DSI contends that by virtue of the Lease Termination, the three supermarkets, for which it had paid, were transferred to Mrs. D'Urso without consideration. DSI also claims that, at the time of the alleged transfer, it was insolvent and did not receive reasonably equivalent value for the Leasehold.

Mrs. D'Urso responds that her termination of the Lease does not constitute a fraudulent conveyance because the necessary elements of a fraudulent conveyance were not present. Primarily, she disputes DSI's contention that termination of a lease is a transfer within the provisions of the Bankruptcy Code (the "Code"). Moreover, she argues the Lease had no value and, therefore, nothing requiring equivalent value was transferred.

In addition, Mrs. D'Urso argues that she is entitled to amounts owed from DSI for un-

2. The Plaintiff does not dispute the legality of the lease termination.

3. It must be noted that DSI had more than ample opportunity to remove its property from the Leased Properties prior to their return to Mrs. D'Urso.

paid rents, taxes and expenses on the Leased Properties and for damages she sustained as a result of DSI's breach of the Lease.

## II. FINDINGS OF FACT

### A. Bankruptcy Related Proceeding

DSI filed its chapter 11 petition on July 9, 1992. That case is pending before the Hon. Prudence B. Abram, U.S.B.J. On August 18, 1993, DSI commenced this adversary proceeding, which was reassigned to me.

### B. Background

#### The Beginning

DSI was a corporation engaged in the business of owning and operating a chain of supermarkets in the New York metropolitan area. The company was founded by Camillo J. D'Urso ("Mr. D'Urso"), who, along with his brother, operated the business. During that time, he was married to Mrs. D'Urso. Even though she was not involved in the financing or operation of the supermarkets, she was the Vice President for Design and Planning. In that role, Mrs. D'Urso was responsible for the color scheme, decoration and layout of the supermarkets.

In November of 1986, Mr. D'Urso died. Mrs. D'Urso, who was the sole trustee of an inter-vivos trust created under an agreement dated April 16, 1973, became the sole executrix of her husband's estate.

After Mr. D'Urso's death, Mrs. D'Urso tried to run the business. She became the Chairman of the Board and Chief Executive Officer of DSI. Albert Ferraldi, the president of the company, ran the day to day operations. Mr. Ferraldi had been Vice–President and Chief of Purchasing, prior to Mr. D'Urso's death.

At the time of Mr. D'Urso's death, Mr. and Mrs. D'Urso had four children: Lisa, who was twenty-two, twins, Mark and Donna, who were twenty-four, and David, who was twenty-five. Except for David, who had worked in his father's company since he was eleven or twelve, none of the children had been substantially involved in the business prior to Mr. D'Urso's death.

While he attended college, David worked at DSI as an Assistant Controller. After he graduated from college, he worked in the stores to learn the business. He was an Assistant Grocery Manager in the Lefferts Store for five months, Grocery Manager of the Queens Village store for seven months and a Manager in the Coop City store. He then spent a year and a half at a store on Boston Post Road in the Bronx, where he was promoted to Assistant Store Manager. In August of 1986, he was promoted to Store Manager of the Kissena Boulevard store in Flushing, Queens. He had been there for four months when his father died.

After Mr. D'Urso's death, David became Vice President and the Administrative Assistant to the President. David's primary function was to oversee all payments. He also analyzed leases for Ferraldi.

David held the title of Vice President for about a year and a half. When his mother decided to sell the stores, David went into the field as a District Manager, with responsibility for six stores in The Bronx. Once the stores were sold, he worked on closing the books and then left DSI to pursue jobs with other supermarket companies. Eventually, he went to D'Agostino Supermarkets, where he worked until the summer of 1992.

#### The Sale

In 1988, Mrs. D'Urso decided to sell the business. She had been diagnosed with cancer and, although she had intended to keep the business in the family, she felt her children were too young to run it. Mrs. D'Urso retained Solomon Brothers to implement the sale.

In 1988, Mrs. D'Urso was introduced to Fredrick Schulman ("Schulman"),[4] an attorney in the real estate business. Schulman, his sister, Faye Peltz, and her husband, Sam

---

4. DSI relied heavily on the testimony of Schulman. He was, however, a less than credible witness. By his demeanor and testimony, he appeared to be withholding information. (Indeed, although he may have had the entire picture before him, he withheld information from even his own experts.) In addition, he was impeached by a showing of self interest and a desire to protect interests of his sister, Faye Peltz. He had a selective memory, particularly on cross-examination.

Peltz ("Peltz"), were active in the supermarket industry.

Schulman offered to purchase the stock of DSI on behalf of himself and T.F. Acquisition Corp. ("T.F."), a company controlled by Peltz. DSI, however, was not Schulman's first experience in the supermarket industry. Schulman testified that he had "grown up" in the business. His sister Faye was an owner and operator of supermarkets. Schulman worked in her stores while he attended college and law school. After graduation from law school, he performed legal work for his sister in connection with her supermarket business.

While he worked for her, Schulman observed the bankruptcies of other supermarket chains, including Bohack and Food Fair. He made offers, on his sister's behalf, to purchase Bohack and Food Fair stores.

At the time of the acquisition, Schulman was responsible for arranging and negotiating the financing. Additionally, Schulman functioned as a financial consultant and advisor to T.F. with respect to the relationship between Westinghouse Credit Corporation ("Westinghouse"), one of T.F.'s lenders, and Mrs. D'Urso.

After T.F. acquired DSI, Schulman also performed crisis management, including arranging for supplies, merchandise and inventory for the stores. Schulman, however, neither is an experienced retailer, nor was he substantially involved in the day to day operations of the supermarkets.

On or about June 9, 1989, Mrs. Durso and T.F. entered into a stock purchase agreement (the "Agreement"). Mrs. Durso agreed to sell T.F. all the stock of DSI for approximately $43.2 million. The deal closed on August 31, 1989. On that date, T.F. was renamed DSI.

The purchase was highly leveraged. T.F. borrowed $35 million from Westinghouse, which was paid to Mrs. D'Urso at the closing. The remaining $8.2 million was paid by a

note (the "Note") secured by a first mortgage (the "Mortgage") on three supermarket properties, Co-Op City, Avenue A, and East 115th Street. The Note, which was personally guaranteed by Peltz and Schulman, was due on September 1, 1991.

As part of the Agreement, Mrs. D'Urso and DSI contemporaneously signed a 21-year lease/purchase option agreement (which is the Lease at issue), for the Leased Properties and a fourth property at East 110th Street in Manhattan. It included a 15-month option for DSI to buy the realty for $5.8 million. The rent was calculated as a 11.5% return on the option price, unless DSI failed to exercise it, in which case it increased to 16% of the option price. DSI did not exercise its option.

Immediately following the execution of the Lease, the East 110th Street property was sublet, with Mrs. D'Urso's permission.

*The Cross–Default Provision*

The Note and the Lease contained cross-default provisions (the "Cross–Default Provision"). Under section 13.01(a) of the Note, an event of default is defined as a "failure to make payment of any part of the indebtedness to be paid under the note." In the event of default, Mrs. D'Urso could, among other things, consider the entire outstanding principal balance, together with accrued interest, due and payable.

Additionally, section 11.01(g) [5] of the Lease provides that any event of default under the Mortgage is a default under the Lease "if as a result of that default, the entire unpaid principal balance of that debt shall have become due and payable." Therefore, if DSI defaulted on the Note, Mrs. D'Urso could declare the Lease in default. The Cross–Default Provision was drafted to make a default under the Note particularly unattractive to DSI.

---

**5.** Section 11.01(g) of the Lease states:

Section 11.01. Events of Default. Each of the following shall be an "event of Default": (g) Any event of default under either of the two mortgages on Tenant's real property made by Tenant to Landlord contemporaneously with the making of this Lease to secure a debt of eight

million two hundred thousand ($8,200,000) dollars owed by T.F. Acquisition Corp to Landlord, representing a portion of the price paid by T.F. Acquisition Corp. for purchase of Tenant's capital stock from Landlord, if as a result of that default, the entire principal balance of that debt shall have become due and payable.

In 1990, Mrs. D'Urso gave DSI written notice that all of the right, title, and interest in the Note, Mortgage, Lease and Leased Premises had been assigned by Florence B. D'Urso as Executrix of the Estate of Camillo D'Urso, to Florence B. D'Urso as Trustee.

### DSI begins to Experience Financial Troubles

By the spring of 1991, it was clear that DSI was having trouble making its payments to Westinghouse. In early March of 1991, DSI defaulted on its obligation to Westinghouse. In addition, it was having trouble making interest payments on its various debts. It was Schulman's responsibility to deal with Westinghouse.

In the spring of 1991, Schulman approached Westinghouse and asked it to allow DSI to sell certain stores and then apply the proceeds to paying down some of the debt, the result being an increase in working capital, which DSI would then apply to the upcoming $8.2 million payment to Mrs. D'Urso. Schulman also asked Westinghouse for financing to satisfy Mrs. D'Urso's Mortgage and for consent to sell the chain as a whole. Finally, he asked Westinghouse whether it was willing to discount its loan or defer some payments, in the event DSI could not find a new lender. Westinghouse rejected all of Schulman's requests.

About the same time, Schulman had discussions with Peter Preiser, Mrs. D'Urso's attorney, concerning DSI's financial status. Schulman asked whether Mrs. D'Urso would refinance, rollover or allow a partial payment of the loan. He also asked Preiser whether DSI could sell one or more of the Mortgaged or Leased Properties separately, as opposed to selling all of the Properties together. Ultimately, Mrs. D'Urso allowed DSI to sell one property under the Lease, the East 110th property, and one property under the Mortgage, the East 115th property. However, she did not agree to refinance the loan.

DSI approached financial institutions, including Bankers Trust Company and Manufactures Hanover Trust Company about new financing. In addition, it approached two potential buyers about purchasing the company. Ultimately, DSI was unable to secure either a buyer or a lender.

On September 1, 1991, $8.2 million was due to Mrs. D'Urso. Until then, DSI had been current with all of its obligations under the Lease. However, DSI had missed two principal payments to Westinghouse of $2 million and was in arrears $1.1 million in interest. Another principal payment of about $1 million was due to Westinghouse on September 15, 1991.

### The Default

DSI did not make the $8.2 million payment. On September 4, 1991, Mrs. D'Urso gave DSI written notice of its default under the Mortgage and demanded that it cure its default within the seven-day period specified in section 11.01(a) of the Note.

DSI did not cure its default. On September 13, 1991, Mrs. D'Urso served DSI with notice of its failure to cure its default and of its consequent defaults under the Note, Mortgage and Lease. That notice advised DSI that the "undersigned ... gives notice that said lease and the term thereby demised shall expire and terminate on the 17th day of September 1991...." Although it defaulted on the Note, DSI still continued to tender rent payments to Mrs. D'Urso, which she refused. This continued until the day the stores were turned over to Mrs. D'Urso.

### The State Court Actions

On September 13, 1991, DSI commenced an action in New York State Supreme Court for a judgment declaring that the Cross–Default Provision in the Lease was not triggered by the mortgage default and a *"Yellowstone"* [6] Injunction ("Durso I").

Mrs. D'Urso answered and counterclaimed for a declaration that the Lease's Cross–Default Provision had been triggered by the mortgage default and that the Lease was terminated. Mrs. D'Urso then moved, and DSI cross-moved, for summary judgment.

---

**6.** *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (Ct.App.1968). A court may stay a lease termination period from running to permit a default to be corrected or to adjudicate a dispute between a landlord and a tenant.

On February 11, 1992, Acting New York State Supreme Court Justice Shirley Fingerhood granted summary judgment to Mrs. D'Urso dismissing DSI's complaint and declaring that DSI defaulted under the lease. In her unpublished opinion, Justice Fingerhood held that "as a result of failing to pay the entire balance of a debt, the entire balance became 'due and payable'." In addition, she held that the default language was not ambiguous. She found, "Plaintiff's [DSI's] officers are sophisticated businessmen who were extensively counseled before entering into the agreements at issue. If indeed [DSI] understood the agreements to mean that they could fail to pay the debt when due without defaulting on the Lease, that misunderstanding is irrelevant."

Justice Fingerhood was affirmed by the Appellate Division on May 4, 1993.[7] Shortly thereafter, Mrs. D'Urso commenced eviction proceedings in Bronx, Queens and Nassau County courts.

A few weeks after DSI commenced Durso I, Mrs. D'Urso sued DSI, Peltz and Schulman on the Note for $8.2 million plus interest, costs and fees ("Durso II").

DSI answered and asserted two counterclaims: (1) for a judgment declaring the Note unenforceable pursuant to sections 510 and 513 of the New York State Business Corporations Law[8] and (2) for a judgment that DSI had been rendered insolvent or unable to meet its obligations to its creditors, by the Note and Mortgage and that, therefore, the executions of the Note and Mortgage were fraudulent conveyances in violation of section 273 N.Y. Debtor Creditor law.

Mrs. D'Urso then moved for summary judgment and DSI cross-moved for summary judgment.

On April 23, 1992, New York State Supreme Court Justice Joan Lobis, in an un-published opinion, granted summary judgment to Mrs. D'Urso. In her decision, Justice Lobis held that DSI received the benefit of its bargain, which it helped structure, and that it was estopped from asserting protection under New York's Business Corporate Law sections 510 and 513. In addition, Justice Lobis addressed the issue of DSI's insolvency. She determined that "defendants have presented no proof that DSI was at the time of the sale of stock or currently, in danger of becoming insolvent, to wit unable to meet its debts as they come due."

On May 29, 1992, DSI moved to renew or reargue. On July 1, 1992, that motion was denied.

On July 6, 1992, judgment was entered for Mrs. D'Urso in the amount of $8,196,690.50, which reflected a set-off of $975,000 from the sale of the East 115th Street property and added approximately $971,000 in interest. The Appellate Division affirmed Justice Lobis on February 1, 1994.[9] DSI moved unsuccessfully for leave to appeal to the Court of Appeals.[10]

In March 1994, DSI moved in state court to renew Durso II based on newly discovered evidence of fraud. On April 19, 1995, Justice Lobis denied that motion. On May 26, 1995, the defendants in Durso II filed notices of appeal.

### The Bankruptcy Proceeding

On July 9, 1992, DSI filed a petition under Chapter 11 of the Bankruptcy Code. Prior to filing its petition, DSI was experiencing difficulties in purchasing inventory for its stores. Schulman testified on cross-examination that DSI's troubles began even earlier. As DSI approached the spring and early

7. *Durso Supermarkets, Inc. v. Florence B. D'Urso*, 193 A.D.2d 377, 596 N.Y.S.2d 827 (App.Div. 1st Dept.1993).

8. DSI argued that Mrs. D'Urso's redemption of shares was in derogation of the rights of creditors because under New York Business and Corporation Law section 510, a corporation may not make a distribution of property if the corporation is currently insolvent, would be made insolvent, and under section 513, a corporation may only purchase its own shares, or redeem its redeemable shares, out of surplus, except when the corporation is currently insolvent or it would be made insolvent.

9. *Florence B. D'Urso v. Durso Supermarkets, Inc.*, 201 A.D.2d 251, 607 N.Y.S.2d 260 (1st Dept. 1994).

10. 83 N.Y.2d 906, 614 N.Y.S.2d 387, 637 N.E.2d 278 (1994).

summer of 1992, its inventory was becoming thinner and its gross sales were declining.

When it filed for bankruptcy, DSI was still in physical possession of the Leased Properties. During the summer of 1992, the three stores were closed. At that point, Consolidated Edison, in New York City, and Long Island Lighting Company, in Freeport, stopped supplying electricity to the Leased Properties, as well as the other stores in the DSI chain.

During the time that the stores were being closed, Schulman assumed much of the responsibility for operating DSI, including providing security for the stores and consolidating inventory. Since the electricity was being shut off, it was essential to move perishable foods to open stores with electricity. Some perishables, such as frozen foods, remained in the Leased Properties through August and September of 1992. That merchandise spoiled and was, ultimately, cleaned out.

After the perishables were removed from the stores, the stores were cleaned, pesticides were used and they were "cherry bombed," to remove odors. At that point only nonperishable merchandise, which included canned foods, paper goods, and health and household goods, were left on the shelves. At the same time, DSI hired 24 hour security people for all of its stores. Schulman testified that there had been only one break in, at the Fteley Store, which had resulted in some merchandise being taken.

During the second week of November 1992, Schulman visited the Fteley, Lefferts and Freeport Stores, accompanied by Martin Eidelstein, DSI's Chief of Operations, and a man from the security force. Schulman brought a still camera, and the security person, a video camera.

Upon arrival at the Fteley Store, the gates were rolled up and Schulman, Eidelstein and the security man walked through the store. They proceeded down each aisle and looked at the area where most of the equipment, i.e., the refrigerators, was located. This same procedure was followed in the Lefferts and Freeport Stores. DSI submitted photographs of the three stores.

Schulman testified that the outside of the Fteley Store appeared to be secure, with the windows intact. He did not observe insects or rodents.

He testified that the Freeport Store also appeared to be secure and there were no observable water leaks or signs of vandalism. Inside, the store appeared to be clean and there were no signs of rodents or bugs. The equipment and shelving did not appear to be vandalized.

He further testified that the Lefferts Store showed no signs of deterioration or vandalism and appeared secure. Additionally, the store was clean and dry. During the visit to the Lefferts Store, Schulman did not observe signs of rodents or insects. The equipment appeared to be in good condition.

About the same time that he made his visits to the stores, Schulman instructed Eidelstein to retain Ace Inventory ("Ace") to take a full inventory of the stores. Ace had been hired on previous occasions by both Peltz and the D'Urso family to take inventories of the stores. Schulman also asked Eidelstein to check the equipment in the stores against a list that Schulman provided.

As part of his responsibilities, Schulman worked with the inventories that were being taken at the various stores. He determined the gross markup, meaning the markup over the wholesale cost of the inventory. In order to determine the value of the inventory, Schulman reduced the inventory retail price by 20 percent. He made no effort to ascertain what an arms length buyer would pay or whether there was any market for the inventory, nor did he consider the cost of moving the inventory to another location.[11]

### The A & P Offer

After filing the bankruptcy petition, and after both the default and the state court's

---

11. It is significant to note in evaluating the inventory left in the stores, DSI first took the best merchandise out and moved it to its other stores. It then sold to one of its suppliers, White Rose, some of the remaining inventory, that White Rose wished to buy. We are dealing here with what was left. There is some reason to believe that what was left had a short remaining shelf life. There is no reason to believe that anyone would buy it.

denial of the *"Yellowstone"* motion, Schulman attempted to find buyers for the three stores. Among those Schulman contacted were A & P, Radick Corporation, Shop–Rite, White Rose Foods, Associated Foods, Crasdale Foods and Key Food. Out of all the stores he contacted, A & P was one of the few that expressed some interest.

Schulman provided A & P, as well as other possible purchasers, with information concerning the general size and area of the stores, as well as, historical data. In addition, he also provided them with some sales and real estate tax information. The information was primarily for the Lefferts Store.

After submitting the information, Schulman received a letter from Brian Pall, who at the time was the Vice-President of Real Estate for Waldbaums, a supermarket chain subsidiary of A & P. Pall was responsible for obtaining and reviewing new site locations for Waldbaums, as well as negotiating purchases and leases of new stores. At some point, either before or after he received the information on the Lefferts Property, Pall visited the store with other senior Waldbaums executives.

Subsequent to that visit, Pall and Schulman exchanged many phone calls negotiating a deal for the Lefferts Store alone.[12] A & P made an offer on about November 6, 1992. Pall proposed an all cash deal for $6,500,000, subject to an environmental review, a structural engineering review and approval by the A & P board and the Chairman of A & P. If the fee was not available, Pall offered to lease the store for $3,100,000. The offer was clearly less than firm.

Mrs. D'Urso took no part in the DSI/A & P negotiations. She gave no indication that she was amenable to separating the Lefferts Store from the others or that she wished to sell the Lefferts Store at all. A & P became aware that there were problems with the fee owner of the property and at some point was given an indication that DSI would not be able to deliver the premises.

12. It is interesting to note that at the time Schulman was negotiating with Pall, DSI did not have a lease for the Lefferts Store or any interest in

*The Stores are Returned to Mrs. D'Urso*

In November 1992, DSI agreed, before Judge Abram, to surrender physical possession of the Leased Properties to Mrs. D'Urso, with a "reservation of rights." On November 19, 1992, DSI surrendered possession. Although Mrs. D'Urso did not receive possession until November 19, she previously provided overnight guards at the Fteley store.

When she took possession of the three supermarkets, Mrs. D'Urso had no desire to return to the supermarket business. However, her sons, David and Mark, did. Mark was thirty and David, thirty-one.

At that point, David became involved with the three stores. He secured the buildings, had electricity restored and installed telephone lines and alarm systems. In addition, he and Mark visited the stores, and during their inspection, found them in poor condition. There was evidence of vandalism, broken windows and vermin. In addition, there was a foul odor.

Once the electricity had been restored, David returned to the stores with Lucio Cavaliere, a contractor, Mike Viesti, a display case and equipment installer and carpenter, and Ed Wiegand of Rac Mechanical, a refrigeration, air-conditioning and heating systems installer. Cavaliere, who was married to Mr. D'Urso's cousin, had worked for Mr. D'Urso for more than ten years.

According to David, these visits occurred in the beginning of December 1992. However, Wiegand testified that they occurred in January or February of 1993. The purpose of the visits was to determine what needed to be done to restore the stores to operating condition.

The first stop was the Lefferts Store. David observed that oil was leaking from the motors in the motor room. Some of the fans did not work, and the air-conditioning system had broken belts.

These observations were substantiated by Wiegand, who also testified that there was oil on the floor and moisture in the refrigeration

the fee. He was not authorized by Mrs. D'Urso nor, apparently, by Westinghouse.

units. He recommended that the equipment on the mezzanine level be replaced, but opined that some of the cases could have been repaired.

After Lefferts, the group inspected the Freeport Store. It had been broken into and its front windows were broken. Many of the displays had been knocked down. Wiegand testified that, although the Freeport Store was not in as bad a condition as the two other stores, it was clear that the air-conditioning units had not been maintained properly.

After Freeport, David and his group visited the Fteley Store. David testified that this store was in the worst condition of the three. This observation was supported by Wiegand. There was substantial vandalism on the roof. Copper piping had been cut out and stolen, and the store had been broken into. In addition, there was a considerable amount of water in the front of the store. David reported rats the size of cats in the store.[13]

Wiegand testified that there were six refrigeration units on the roof, but that most of the major parts had been removed, essentially leaving empty shells. The piping from the units on the mezzanine level also had been removed, making testing the units impossible. In addition, he saw oil on the floor of the motor room. Wiegand recommended that the equipment be replaced.

After the visits, David and Mark decided to concentrate on the Lefferts Store.

In December 1992, David, Mark, Mrs. D'Urso, Lisa, Preiser and Harry Slinger, Mrs. D'Urso's tax accountant, met to discuss the formation of a company to be run by David and Mark. That company would own and operate a food market at the Lefferts Store. As a result, D'Urso Lefferts Food Corporation was formed. Mark and David were its primary shareholders, and Mrs. D'Urso owned ten percent of the shares. Mrs. D'Urso contributed capital, provided a $300,000 loan for renovations and guaranteed a $700,000 loan. In the event of a dispute between the brothers, Mrs. D'Urso was to be the final arbiter.

The brothers also formed a second corporation, Lefferts Enterprises, Inc. Mrs. D'Urso also owned 10 percent of the shares in that corporation.

On February 1, 1993, Mark and David rented the Lefferts Store from their mother. Under the terms of the lease, they were required to pay a rent of $225,000 per year, triple net. In addition, there was a "percentage of rent" clause, which required the brothers to pay, as additional rent, one percent of all sales over $15 million.

About the same time that David and Mark were forming their corporation, David prepared an analysis of the three locations, which included a current liquidation value, a current in-place value and a current replacement value of all the equipment in the stores. The current liquidation value is the salvage cost. The current in-place value is the value to a new supermarket operator, assuming that the equipment is usable. The current replacement cost is the cost to replace the equipment, including installation, but not transportation costs.

In preparing the report, David consulted Viesti, Wiegand and other suppliers.

At the time, it appeared that the Freeport Store's equipment was in the best condition. In fact, David and Mark moved some equipment out of the Freeport Store to the Lefferts Store. In order to acquire this equipment, their corporation paid Mrs. D'Urso $4,000, a price that was set by Maltz & Company, an evaluator.

In the beginning of 1993, renovations on the Lefferts Store began. Viesti was paid approximately $225,000 for his work, Wiegand $225,000 for new equipment, and Cavaliere $175,000 for general contracting work. In total, David and Mark spent about $1 million in renovations. Although there were major renovations, the brothers kept much of the in-place fixtures and equipment, but did not pay for them. About March of 1993, the store opened for business.

13. David's report of the condition of the stores differs from that of Schulman's earlier visits. In addition to the fact that David's visit was later, the differences may be partially explained by the fact that David's store inspections were longer and he was accompanied by experts.

## Mr. Fuertes and the Fteley and Freeport Stores

On June 1, 1993, Mrs. Durso entered into a lease on the Fteley Property with Rodolpho Fuertes, who operates other supermarkets in the Bronx. Fuertes had heard about the property through his accountant, Al Silverman, who had been an accountant for the D'Urso family. Silverman put Fuertes in contact with Lisa, Mrs. D'Urso's daughter. After a conversation with Lisa, Fuertes visited the location with Mr. Panolla, the President of Five Town Refrigeration.

Fuertes negotiated the terms of the lease with Lisa and came to an agreement. The annual rent was $150,000, triple net, with certain escalations over the term of the lease. The lease was twenty years with no provision for an extension or an option to buy the fee. Fuertes received a three-month rent concession. He testified that the fact that the store had been closed for sometime, and had lost some of its customer base, had reduced its value.

In addition to negotiating the lease, Lisa tried to sell Fuertes the equipment in the store. Initially, she asked $250,000 for the equipment but lowered the price to $150,000. Finally, Fuertes decided he did not want most of the equipment, because he thought it had no value. He did purchase two pieces of equipment, a baler machine, which compresses cardboard, and a safe for a total of $4,000. He opened the store in October of 1993.

It came to Fuertes' attention, about three months after he opened the Fteley Store, that the Freeport Store was available. He spoke to Lisa about leasing the store and a lease for the store was drafted. Fuertes visited the store and determined that the only in place equipment that had value was some of the meat equipment, which he valued at approximately $25,000.

Fuertes went over the lease and determined that his monthly expenses would be about $30,000 a month. He felt that it would be better to purchase the fee, so he made an offer to Lisa. Ultimately, they agreed on a $2 million purchase price. Fuertes paid $1.2 million in cash and Mrs. D'Urso took back an $800,000 purchase money mortgage. The $2 million included the equipment in the store, to which the $25,000 value was assigned.

The store had some other fixtures and equipment in it, but Fuertes disposed of them.

## Additional Testimony

### Simeon Soterakis

I heard testimony from Simeon Soterakis. Soterakis testified that he is an attorney who does commercial transactional work, specializing in the food industry. Specifically, his work focuses on the acquisition of stores, the negotiation of leases, and putting together deals. He testified that he has worked on between 350 and 500 deals and had represented both sellers and buyers.

In negotiating these deals, Soterakis said that he made efforts to value the supermarket lease or property. He testified that he considers certain factors in doing a valuation. The first factor is "volume," defined as the gross sales on a weekly basis. In determining this, he looks at the purchases a supermarket made. This information is derived not so much from the stores' books and records, but from bills. He then testified that he multiplies the purchases by four to obtain volume.

Soterakis testified that the next factor that he looks at is the leasehold. He looks at the length of the lease and the cost in comparison to sales.

He also testified that he considers the condition of the physical plant, as well as the location. In addition, he considers whether the store is open or closed. If a store has been closed a long time, it is his opinion that it has lost its customer base.

Although I heard Soterakis' testimony, ultimately it carried little weight. Soterakis testified that he had not valued the three stores at issue; nor had DSI or anyone else utilized his method in valuing the stores. No one did a value calculation of the stores applying real numbers to his formula.

In addition, there was no evidence that Soterakis' test is widely used in the industry or generally accepted as accurate.

### Lisa D'Urso

Prior to her father's death, Lisa had no experience in the supermarket business. After his death, Lisa became her mother's per-

sonal assistant, a position she combined with the academic study of business.

After Mrs. D'Urso sold the business, she established an office. From that time, Lisa assisted her mother with her investments and her dealings with DSI. In addition, she was in charge of her mother's files and day to day business affairs.

In the summer of 1992, Lisa received complaints from the New York City Environmental Control Board ("ECB") about the Fteley Store. The complaints concerned rotting food in the store and vermin control. She testified that she tried to contact the ECB to notify them that she did not have responsibility for the stores. However, in October of 1992, Lisa attended a hearing at the ECB about the Fteley Store. Lisa also testified that she received complaints regarding the Freeport Store. As a result, she paid fines to the City of New York and the Town of Freeport for the unsanitary condition of the stores.

With respect to the Fteley Property, once Mrs. D'Urso regained possession, Lisa's responsibility was to put the property back in "working condition." This included bringing in a contractor to check the property for gas leaks, because Con Edison would not turn the electricity on if there were gas leaks. Eventually, electric power was restored. In addition, Lisa testified that she hired an exterminating service and had a security company install a new alarm system.

After the store had been put in "working condition," Lisa focused on leasing both the Fteley and Freeport Stores. In early 1993, signs were posted on the Freeport Store advertising that the store was for rent. Eventually, the sign was changed to a for sale/for lease sign.

In terms of the Fteley Store, Lisa testified that she received between thirty and fifty inquiries. Eventually, this list was narrowed down to three people. After checking financial information and proposed terms, it was decided that Fuertes would be given the lease. On June 1, 1993, the lease was signed.

She also attempted to lease the Freeport Store. When she showed prospective tenants the Fteley store, she would alert them to the availability of the Freeport location. In addition, she spoke to brokers and looked for other retailers. None of these attempts were successful, and she sold the property to Fuertes.

*James G. McCauley*

I heard testimony from James G. McCauley. McCauley, a senior estate appraiser at Helmsley–Spear, a real estate concern, was qualified as an expert appraiser. In 1993, McCauley had been asked by Lisa to appraise the Fteley Store as of September 17, 1991, and as of November 19, 1992. The purpose of his valuation was to determine whether the tenant had any leasehold value, which was defined as the difference between the market rental value and the tenant's contract rental value. In order to determine the market rental value, McCauley looked at the rental value of similar properties in the area.

He determined that the market rental value of the Fteley Store, as of September 17, 1991, was $7 per square foot, although the contract rental was $9.40 per square foot. As of November 19, 1992, the market rental value remained at $7 per square foot, but the contract rental had increased to $9.69 per square foot.

He also performed valuations for the Lefferts and Freeport Stores. McCauley determined that as of September 17, 1991, the fair market rental value of the Lefferts Store was $9 per square foot, although the contract rental was $12.58 per square foot. As of November 19, 1992, the fair market rental value remained the same, but the contract rental rent had increased to $12.87 per square foot.

For the Freeport Store, McCauley determined that the fair market rental value as of September 17, 1991, was $9 per square foot, although the contract rental was $9.80 per square foot. As of November 19, 1992, the fair market rental value remained at $9.00 per square foot, but the contract rental had increased to $10.08 per square foot. However, 2,720 square feet of mezzanine space was excluded in the overall arithmetic calculation of the contract rent.

For each of the properties, McCauley opined that DSI's interest in its lease had no value.

McCauley did not actually visit the stores in 1991 and 1992. He testified that 1993 was not the first time that he had been asked to value the three properties. In 1987, after Mr. D'Urso died, he valued the properties for purposes of an estate valuation. In those valuations, McCauley attempted to do an income valuation and a sales valuation. In doing the income valuation, McCauley determined the market rental value of the properties. McCauley testified that the market rental values of all three properties had declined since 1987.

*Lucio Cavaliere*

I received testimony from Lucio Cavaliere by deposition. Cavaliere testified that he worked for Mr. D'Urso as a supervisor of construction contract work. In 1982, Cavaliere bought a 50% interest in Petco, a company which specialized in supermarket construction. For the past fourteen years, he has been President of Petco.

In December of 1992, Cavaliere received a call from Lisa and David. As a result of this call, he met with David at the Lefferts Store. Also in attendance were Viesti and Wiegand. The meeting consisted of a four-hour walk through of the Lefferts Store.

Cavaliere testified that he made recommendations to David as to what needed to be done in the store in order to reopen it. He suggested that David remove the entire motor room and install a new compressor. He did not turn on the compressor, but based his opinion on the physical condition of the compressor.

He also suggested that David replace a gondola because the metal appeared to be rotten. He suggested that the showcases be replaced, because it would be too costly to try to repair them and recommended that the floor, the lighting, the refrigeration, the roof and the cart corral be replaced. He opined that a new vestibule should be installed. Subsequently, some of his recommendations were implemented.

Cavaliere also inspected the Freeport and Fteley Stores in 1992. As with Lefferts, Cavaliere did a walk through of the stores. He visited the Fteley Store three times. On one occasion, he recommended to Lisa that the store be exterminated because he observed large rats and spoiled food.

During his second visit, he was joined by Wiegand. They went up to the roof, where they determined that the refrigeration line had been vandalized. Cavaliere recommended that the refrigeration be replaced, as well as all of the refrigeration systems inside the store.

With regard to the Freeport Store, Cavaliere testified that Lisa inquired of him whether he knew of anyone who would be interested in buying or leasing the Store. Subsequent to this inquiry, he visited the store and recommended to Lisa that she reinstall the electric power, secure some of the glass, board up the windows, exterminate the store and remove the spoiled merchandise. He testified that he made no recommendations concerning renovations or replacement or removal of equipment. Prior to the store being sold to Fuertes, Cavaliere fixed the sidewalk, repaired some structural damage and replaced the sprinkler system. This work was completed in September or October 1993.

Cavaliere further testified that, in December of 1993, he solicited bids and made inquiries of various companies as to the removal of the equipment at the Freeport Store, because Fuertes wanted everything out of the store.

## III. LAW

### A. Section 548

DSI brings this adversary proceeding under section 548 of the Code, which states, in pertinent part:

(a) The Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

11 U.S.C. 548; *BFP v. Resolution Trust Corp.*, —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), *reh'g denied,* —— U.S. ——, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994).

Therefore, to succeed, DSI must demonstrate that (i) a transfer of an interest in property occurred within one year before the date of the filing of the bankruptcy petition; (ii) DSI had an interest in that property; (iii) that DSI was insolvent on the date of the transfer; and (iv) that DSI received less than a reasonably equivalent value in exchange for the transfer. *Id.* at ——, 114 S.Ct. at 1760.

■ For purposes of section 548, federal law determines "what constitutes a transfer and when it is complete." *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), *quoting McKenzie v. Irving Trust Co.,* 323 U.S. 365, 369–70, 65 S.Ct. 405, 407–08, 89 L.Ed. 305 (1945). However, state law defines the nature and limitations of the debtor's "property interest" in the lease. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *McKenzie v. Irving Trust Co.,* 323 U.S. at 370, 65 S.Ct. at 408.

■ In order to prevail on its section 548 claim, it is incumbent upon DSI to prove each element. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir. 1981); *Consolidated Partners Inv. Co. v. Lake,* 152 B.R. 485 (Bankr.N.D.Ohio 1993); *In re Vurchio,* 107 B.R. 363 (Bankr.M.D.Fla. 1989). Each element must be established by a preponderance of the evidence. *In re Kelton Motors, Inc.,* 130 B.R. 170 (Bankr.D.Vt. 1991).

### B. Whether a Transfer Occurred

■ Section 101(54) of the Code defines "transfer" as:

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including the retention of title as a security interest and foreclosure of the debtor's equity of redemption.

"It is clear that in defining 'transfer' as it did in Section 101(54), Congress intended to make it as broad as possible." *In re Metro Water & Coffee Services,* 157 B.R. 742, 745 (Bankr.W.D.N.Y.1993) (affirmed in an unpublished opinion 93–CV–6433T); *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 314 (1977).

### 1. Was the Lease a Transfer of an Interest in Property or an Executory Contract

■ It has been established that if a transfer occurred, it did so on September 17, 1991. DSI argues that Mrs. D'Urso's remedies under the Lease allowed her to receive back the very same operating business she sold pursuant to the Stock Purchase Agreement. In support of its theory, DSI relies on case law which supports the proposition that the termination of a lease constitutes a transfer.

Mrs. D'Urso, on the other hand, argues that the default and subsequent termination of a lease is not a transfer for purposes of section 548, reasoning that modern legal thinking characterizes leases as contracts in nature, not merely interests in real property.

■ In determining whether this lease was a contract or an interest in real property, I am bound by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

As defined by New York State's Real Property Law sections 290 and 291, a lease for a term of more than three years is a recordable instrument reflecting a "conveyance of real property." It is considered an "interest in real property" under New York's General Obligations Law section 5–703. However, although a lease creates an interest in real property, it is not regarded exclusively as realty under New York law. Rather, "under a long line of New York decisions, the interest of a tenant of realty under a real estate lease is not realty but is a chattel real which is Personal property." *Fort Hamilton Manor, Inc. v. Boyland,* 4 N.Y.2d 192, 197, 173 N.Y.S.2d 560, 563, 149 N.E.2d 856, 858 (1958).

Although New York courts have shown an increased willingness to apply principles of

contract law to leases (*see Geraci v. Jenrette,* 41 N.Y.2d 660, 394 N.Y.S.2d 853, 363 N.E.2d 559 (1977); *57 E. 54 Realty Corp. v. Gay Nineties Realty Corp.,* 71 Misc.2d 353, 335 N.Y.S.2d 872 (1st Dept.1972)), this willingness has been most apparent with regard to residential leases in multiple dwellings. *Park West Management Corp. v. Mitchell,* 47 N.Y.2d 316, 418 N.Y.S.2d 310, 391 N.E.2d 1288 (1979), *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979).[14] In these cases, the issues the courts faced were whether a lessor has an affirmative duty to mitigate damages in the event of a lessee's default and the reach of statutory and common law warranties of habitability as applied to residences.

Mrs. D'Urso urges the application of contract principles to this commercial lease. If she is correct, since the expiration of contractual rights due to the debtor's default is not a "transfer" or "conveyance" of those contractual rights, DSI's case would fall. *In re Wey,* 854 F.2d 196, 199 (7th Cir.1988); *In re Robinson,* 169 B.R. 171 (N.D.Ill.1994), *aff'd, Robinson v. Chicago Housing Authority,* 54 F.3d 316 (7th Cir.1995); *In re Coast Cities Truck Sales,* 147 B.R. 674 (D.N.J.1992), *aff'd, Coast Cities Truck Sales, Inc. v. Navistar Inter. Transp. Co.,* 5 F.3d 1488 (3d Cir.1993).

DSI argues that although New York courts have applied contractual principles to residential leases, this court should decline to do so in the context of a commercial lease.

Recently, the New York Court of Appeals spoke to this issue while considering whether a commercial lessor has the duty to mitigate damages upon the tenant's abandonment of the real property and subsequent eviction. *See Holy Properties Limited, L.P. v. Kenneth Cole Productions, Inc.,* 87 N.Y.2d 130, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995). In that case, the Court of Appeals refused to extend the contract theory to a commercial lease. "[U]nlike executory contracts, leases have been historically recognized as a present transfer of real property." *Id. See also, In re Ames Department Stores, Inc.,* 158

B.R. 35 (S.D.N.Y.1993); *Sage Realty Corp v. Kenbee Management–New York, Inc.,* 182 A.D.2d 480, 582 N.Y.S.2d 182 (1st Dept.1992); *Rubin v. Dondysh,* 153 Misc.2d 657, 588 N.Y.S.2d 504 (N.Y.Sup.Ct.1991). Therefore, for purposes of determining whether a transfer occurred under Section 548, the lease between DSI and Mrs. D'Urso must be considered an interest in real property and not an executory contract.

New York remains, essentially, a common law state, so far as this issue is concerned. The landlord owns the realty "fee simple absolute."[15] That means the property belongs to the landlord and her heirs and assignees until the end of time, to use or do with as she and they please. A lease cuts out a piece of the fee and transfers to the tenant the right to use the realty, as though the tenant was the owner, for a finite term. In essence, it transfers ownership to the tenant for the term of the lease.

The right to use the fee for a specific term is usually conditioned on various things, including the lessee making certain payments to the landlord and, sometimes others, such as a taxing authority. If the tenant defaults under the lease, the remainder of the term leased to the tenant is returned to the owner to remerge with the fee.

### 2. Did the Default Under the Lease Constitute a Transfer Under Section 548

■ The New York Court of Appeals having determined that a commercial lease is a transfer of an interest in real property and not an executory contract, I must now decide whether, under Section 548(a), a transfer of an interest of the Debtor occurred. That is, whether the termination of the lease falls under the definition of "transfer" under Section 101(54) of the Code, and then whether that transfer is voidable as a fraudulent conveyance under Section 548 of the Code.

The case law on this area is sparse. *See In re Ferris,* 415 F.Supp. 33 (W.D.Okla.

---

14. The *Park West* line of cases includes one by me sitting as a New York City Civil Court Judge. *111 East 88th Partners v. Simon,* 106 Misc.2d 693, 434 N.Y.S.2d 886 (N.Y.Civ.Ct.1980) *modified on other grounds,* 127 Misc.2d 74, 489 N.Y.S.2d 139 (N.Y.App.Term.1985).

15. Arguably, in today's world, it is impossible to own realty "fee simple absolute." However, for the purpose of this dispute, the concept is relevant.

698

1976); *In re Pinto,* 89 B.R. 486 (Bankr. E.D.Pa.1988); *In re Edward Harvey Co.,* 68 B.R. 851 (Bankr.D.Mass.1987); *In re Queen City Grain, Inc.,* 51 B.R. 722 (Bankr. S.D.Ohio 1985); *In re Fashion World, Inc.,* 44 B.R. 754 (Bankr.D.Mass.1984). The cases finding a transfer have largely declined to engage in an extensive discussion of the transfer issue itself, relying more on an almost visceral or axiomatic analysis: "Extended consideration of the question is unnecessary. There is just no getting away from the fact that upon the termination of [the] lease, there was a 'parting with an interest in property,' for after the termination of the lease [debtor] no longer had an interest in the ... grain elevator facility." *In re Queen City Grain,* 51 B.R. at 726. "It is apparent from the Code's broad language [in defining 'transfer'] that a pre-petition lease termination constitutes a transfer within the meaning of § 101(50) [identical now as § 101(54)]." *In re Indri,* 126 B.R. 443, 446 (Bankr.D.N.J.1991).

The essence of a commercial lease termination is that the remaining lease term is returned to the fee owner to merge with the fee. That is certainly a "transfer" in the common legal meaning of the term.[16] It is also a transfer under Section 101(54) of the Code. DSI's failure to make the September 1, 1991 mortgage payment constituted a default under the lease. The fact that the default was rooted in a complicated stock purchase agreement does not alter the fact that DSI's failure to make a required payment became a garden variety default under a commercial lease.

Mrs. D'Urso, as the New York courts have held, was legally within her rights to terminate the lease.[17] Despite the nature of the deal, the facts are not much different from other cases dealing with lease terminations resulting from defaults. The termination of a defaulted lease, with a concurrent stock repurchase, has been deemed a transfer of both assets. *In re Pinto,* 89 B.R. 486 (Bankr.E.D.Pa.1988).

Given the broad definition of the term "transfer" under the Code, as amended, as well as the extensive application of § 548(a) to a variety of transactions, we have no doubt that there was a "transfer" of [Plaintiff's] interest in both the leasehold and the stock. Such transfer was effectuated when the Defendant sent its letter of November 11, 1986, which both terminated [Plaintiff's] lease and exercised Defendant's option to purchase [Plaintiff's] stock. Prior to that letter, [Plaintiff] had an interest in a store lease ... [a]lso, prior to that time, [Plaintiff] held twenty shares of the Defendant's stock. *Id.* at 496–97.

Indeed, it is not necessary for the lessee to have defaulted on the lease for a transfer to occur. A subsequent agreement amending an existing lease in favor of the lessor has been found to be a transfer for the purposes of section 548. *In re Fashion World, Inc.,* 44 B.R. 754 (Bankr.D.Mass.1984). "By providing the defendant/landlord with a right to terminate upon 30–days notice, the debtor, was, in effect, transferring its interest in the lease and its $260,000 value." *Id.* at 756.

In her attempts to distinguish those cases that find a lease termination to be a transfer, Mrs. D'Urso argues that because the Lease ended upon the happening of an event specified in the conditional limitation clause, there was nothing left for DSI to transfer.

The issue is not the value of what was transferred, only whether a transfer occurred. I am convinced that, up until the date of legal transfer, September 17, 1991 (as opposed to the date of physical transfer, November 19, 1992), DSI possessed an interest in property, a small portion of the fee, that was reconveyed to Mrs. D'Urso. The

**16.** Black's Law Dictionary defines a transfer as: An act of the parties, or of the law, by which the title to property is conveyed from one person to another. The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise. The word is one of general meaning and may include the act of giving property by will.

**17.** *Durso Supermarkets, Inc. v. Florence B. D'Urso,* 193 A.D.2d 377, 596 N.Y.S.2d 827 (1st Dept.1993); *Florence B. D'Urso v. Durso Supermarkets, Inc.,* 201 A.D.2d 251, 607 N.Y.S.2d 260 (1st Dept.1994).

value, if any, of that interest must be determined.

Mrs. D'Urso urges this court to follow case law holding that the termination of a lease does not constitute a transfer. *Robinson v. Chicago Housing Authority,* 1995 WL 360706, *3 (N.D.Ill., June 4, 1995) ("Robinson II"); *Matter of Jermoos, Inc.,* 38 B.R. 197 (Bankr.W.D.Wis.1984); *In re Wey,* 854 F.2d at 199; *In re Coast Cities Truck Sales, Inc.,* 147 B.R. at 677–78. In *Robinson II,* the District Court of the Northern District of Illinois noted that "a small number of courts have held that the pre-petition termination of a lease or other contract for cause can constitute a transfer under § 548, while a larger number have held that it cannot," *Robinson v. Chicago Housing Authority,* 1995 WL 360706, *3, and declined to find a transfer. The *Robinson II* District Court indicated that it was bound by the holding of the Seventh Circuit in *Matter of Wey,* one of the few appellate-level cases. *Wey* held that upon default on an executory real estate purchase contract, "what actually occurred when [the debtor] defaulted was an extinguishment of his equitable interest in the hotel, not a transfer." *In re Wey,* 854 F.2d at 199. Moreover, "possession of expired rights is the equivalent of the possession of no rights. When a termination is pursuant to the terms of a contract, there is no transfer." *Id.; Robinson II,* 1995 WL 360706 *3.

■ In New York, a commercial lease creates a present interest in the real estate, the right to use or control a part of the fee. *See Holy Properties Limited, L.P. v. Kenneth Cole Productions, Inc.,* 87 N.Y.2d 130, 637 N.Y.S.2d 964, 661 N.E.2d 694 (1995). *Wey* dealt with a future interest, which was held not to be a transfer. Here we have a present interest. Under controlling New York Law, *Wey* is not applicable to this case.

In similar support of the "default extinguishes any interest" argument, one court observed that:

"Section 548 has never been construed, nor was it intended, to afford debtors the option of reinstating involuntarily terminated executory contracts. A necessary element for the relief sought by plaintiff under § 548 is a transfer.... Coast Cities possessed no rights as a matter of law which it could relinquish since the contract between Navistar and the debtor expired by its own terms." *In re Coast Cities Truck Sales, Inc.,* 147 B.R. at 677–78.

Similarly:

"[t]he termination of the right to perform on an executory contract, according to the terms of that contract, differs from a transfer of property in this sense: the rights terminated, unlike property, are transformed. At the option of the terminating party, the rights may simply disappear, or as with other kinds of property, may be dispersed, reconveyed or retained." *Matter of Jermoos, Inc.,* 38 B.R. at 204.

The one element that all these cases have in common, is that they all involve executory contracts. The *Robinson* case involved a residential lease, which under New York law is inherently different from a commercial lease. Since it has been determined under New York law that a commercial lease is an interest in real property and not an executory contract, I find that these cases are inapplicable.[18]

In *In re Metro Water & Coffee Services, Inc.,* 157 B.R. 742 (Bankr.W.D.N.Y.1993), the debtor defaulted on a concession agreement. Although the court found that the termination of the concession agreement constituted a transfer under a broad reading of Section 101(54), it ultimately held that the transfer did not constitute a fraudulent conveyance under Section 548:

Although the involuntary termination of the Concession Agreement may constitute a technical "transfer" of the Debtor's interest in the Agreement within the meaning of Section 101(54) and Section 548(a) of the

18. There is an abundant legal basis for the distinction between commercial leases and residential leases for apartments in multiple dwellings. The residential tenant usually leases a small part of the real estate (often an "air lot" many floors above the ground) and contracts for a pledge of non-real estate services such as heat, hot water, electric service, building security and public area and apartment maintenance. The commercial lease at issue here is for a free standing building, rented on a "net lease basis." Indeed, unlike residential leases, only the real estate itself is involved.

Bankruptcy Code and even if it were a conveyance under the New York Debtor and Creditor Law such a pre-petition ordinary course of commercial business non-collusive termination of an executory contract in accordance with the terms of the contract by reason of a Debtor's material defaults is, as a matter of law, not a transaction or transfer which is actually or constructively fraudulent within the meaning, intent and underlying policy of these fraudulent conveyance laws. *Id.* at 745.

Without dealing with the issues of whether the debtor's interest in the concession agreement had any value at the time of the termination, or whether voiding a pre-petition termination of a lease would be inconsistent with the holding of most courts, that such a terminated lease does not constitute property of the estate (*see In re Haines*, 178 B.R. 471 (Bankr.W.D.Mo.1995)), the court instead stood back from the literal application of Section 548 and took "a broad and realistic view of the case at hand." *In re Metro Water and Coffee Services*, 157 B.R. at 746. A major factor which guided the court was the purpose of the fraudulent conveyance statutes:

> The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors. They are not intended to insure that creditors will never be deprived of a valuable asset. The deprivations these statues are designed and intended to prevent are those that are the result of an intentional fraud or a constructive fraud resulting from a wrongful or unwarranted participation on the part of the Debtor, whether by omission or commission. Therefore, not every pre-petition transaction or occurrence which may technically be a transfer under Section 101(54) and which results in a debtor being deprived of an asset ... is necessary voidable as a fraudulent conveyance. *Id.* at 747.

I agree with the reasoning of the *Metro Water* court in that the termination of the lease, due to DSI's material default, did not wrongfully deprive the creditors of the estate of rights to which they would be entitled. At the time of termination, September 17, 1991, DSI lost all legal and equitable rights to the lease. The remainder of the lease term then had merged back into the fee. DSI was left with nothing. Its rights were extinguished. To find otherwise would give DSI's creditors rights in Mrs. D'Urso's real property superior to her own. This interpretation is inconsistent with the spirit and purpose of Section 548:

> It cannot go unsaid that the commercial ramifications of reading Section 548 too literally so as to allow it to be used to avoid a pre-petition, ordinary course of commercial business, non-collusive termination of an executory contract [or lease] in accordance with its terms when the Debtor has materially defaulted under the contract would be devastating. *Id.* at 747–48.

The effect of finding a fraudulent conveyance in the context of a terminated executory contract may be harsh, but in the context of a commercial lease, which is defined as a conveyance of real property, the policy concerns are overwhelming. In that respect, although I may not agree with the holding in *In re Haines*, I am in agreement with the following policy statement:

> The avoidance of non-collusive pre-petition lease terminations as fraudulent transfers presents significant policy considerations. Strict application of such cases ..., would make it impossible to settle rights in real property. Under the ruling in *In re Edward Harvey Co.*, 68 B.R. 851 (Bankr. D.Mass.1987), landlords cannot rely on a state court judgment for termination of the lease and possession of the premises, but must wait until the statute of limitations on fraudulent transfer actions has passes. As one authority concluded, '[t]he *Harvey* [decision] ... will introduce a significant degree of uncertainty into the termination of leases and the transfer, mortgaging, and insurance of property that has been subject to a lease termination.' Robert E. Goodman, Jr., *Avoidance of Lease Terminations as Fraudulent Transfers*, 43 Bus. Law. 807, 832 (May 1988)

*In re Haines*, 178 B.R. at 475.

Additionally, a finding that the termination of the lease is technically a transfer under

Section 101(54), but does not constitute a fraudulent conveyance, squares with those cases which hold that the allowance of a lease termination, as a fraudulent transfer, is at odds with the provision of Section 365(c)(3) which states:

> (C) The Trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignments of rights or delegation of duties, if—
>
> . . . .
>
> (3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.... 11 U.S.C. § 365(c)(3).

In essence, once the lease was terminated, DSI lost whatever legal rights it had under the lease. Therefore, that lease never became property of the estate and was not subject to assumption or rejection under Section 365 of the Code.

Therefore, although I find that the termination of the lease between DSI and Mrs. D'Urso fell within the Section 101(54) definition of "transfer," the transfer, itself, was not a fraudulent conveyance.

### C. Was DSI insolvent on the date of the transfer

Although I believe that the termination of the lease was not a fraudulent transfer, considering the litigation history of this matter, I feel compelled to determine all issues with respect to Section 548.

■ DSI is required to show that, on the date that the transfer occurred, it was insolvent or became insolvent as a result of the transfer. 11 U.S.C. § 548(a)(2)(B). According to the Bankruptcy Code, "insolvent" is defined, in pertinent part, as follows:

> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors[.]

11 U.S.C. § 101(32). In other words, deciding whether Plaintiff was insolvent for my purposes is to be done by determining whether Plaintiff's assets were exceeded by its liabilities, not by whether Plaintiff was unable to pay its debts as they became due. "The test for 'insolvency' under [the Code] is not the inability to meet current obligations but is the state of having liabilities exceed assets." *In re Farmers Bank of Clinton, Mo.*, 383 F.2d 314, 326 (8th Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967). "Insolvency is defined under [the Code] as 'a financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.'" *In re Artha Management, Inc.*, 174 B.R. 671, 678 (Bankr.S.D.N.Y.1994) (*citing In re Coated Sales, Inc.*, 144 B.R. 663, 666 (Bankr.S.D.N.Y.1992)). *Accord, In re Best Buy Drugs, Inc.*, 89 B.R. 997 (Bankr.S.D.Fla. 1988).

#### 1. Fair Value

In order for the debtor to be found insolvent, the debtor's balance sheet's fair value must be exceeded by its liabilities. Many courts have addressed the formulation for determining the "fair value" of the debtor's balance sheet.

> 'Fair valuation' under [the Code] involves a value that can be made available for payment of debts within a reasonable period of time.... The proper standard is that fair valuation of a going concern which an informed willing seller under no compulsion to sell and an informed willing buyer not pressed for an immediate return would attribute to the property. *Dabney v. Chase National Bank*, 98 F.Supp. 807, 814 (S.D.N.Y.1951) (*citing Syracuse Engineering Co. v Haight*, 110 F.2d 468, 471 (2d Cir.1940)). *Accord, In re Storage Technology Corp.*, 51 B.R. 206 (D.Co.1985).

■ The term "fair valuation" is not the same term as "reasonably equivalent value," Therefore the market value, not the distress value, should apply, especially as this is a valuation proceeding, not the judicial review of a sale. *See BFP v. Resolution Trust Corp.*, —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), *reh'g denied*, —— U.S. ——, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994).

## 2. Res Judicata and Collateral Estoppel—State Court Decisions

■ The relevant date by which I must determine whether DSI was insolvent is the date of the transfer, September 17, 1991. *BFP v. Resolution Trust Co.,* —— U.S. at ——, 114 S.Ct. at 1760.

■ To the extent that New York State Courts have ruled, this court is bound by the principles of res judicata and collateral estoppel.

The records and judicial proceedings of any court of any [state], shall be [admitted] in other courts within the United States and its Territories [and] shall have the same full faith and credit in every court within the United States[.]" 28 U.S.C. § 1738. This statute has been found to expressly require bankruptcy courts to honor state court decisions. *See, e.g., Bowers v. Connecticut Nat. Bank,* 78 B.R. 388 (Bankr.D.Conn.), *appeal dismissed,* 847 F.2d 1019 (2d Cir.1987).

The Supreme Court held, "[u]nder res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). The *Allen* Court specifically addressed the importance of federal courts applying the doctrine of res judicata to state decisions. "The federal courts generally have also consistently accorded preclusive effect to issues decided by state courts.... Thus, res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.* at 95–96, 101 S.Ct. at 415 (citations omitted). *See also, Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1981), *rehearing denied,* 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982); *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The seminal Supreme Court test for res judicata is:

When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac,* 94 U.S. 351, 352 [24 L.Ed. 195] (1877). The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatsoever, absent fraud or some other factor invalidating the judgment. *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).

■ "Res judicata precludes the relitigation of a claim that could have been brought in a prior suit, whether or not it was actually brought." *In re Drexel Burnham Lambert Group, Inc.,* 148 B.R. 993, 996 (Bankr.S.D.N.Y.1992) (citations omitted); *see also In re Hartman Material Handling Systems, Inc.,* 141 B.R. 802 (Bankr.S.D.N.Y. 1992). Thus, federal courts must bow to final state decisions on the merits.

■ Res judicata is complemented by collateral estoppel, which prevents relitigating issues presented in successive cases. "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel can be distinguished from res judicata in that res judicata is used to bar successive relitigation of the same issue, whereas collateral estoppel bars successive relitigation of facts or smaller issues as part of different, subsequent issues. "But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel [as to those issues] upon the determination of which the finding or verdict was rendered." *Cromwell v. County of Sac,* 94 U.S. 351, 353, 24 L.Ed. 195 (1876); *In re Hartman Material Handling Systems, Inc.,* 141 B.R. 802, 810 (Bankr.S.D.N.Y.1992).

Thus, as federal courts must bow to state decisions on the merits, they must also bow to relevant findings of fact by the state courts.

Where there are factual issues presented here upon which the New York state courts have ruled, the parties have had their "day in court." I will not revisit them.

██ However, an issue of fundamental importance to this case which was not addressed in any of the state cases is whether Plaintiff was insolvent on the date of the transfer, September 17, 1991. This issue is not collaterally estopped and I will address it.

Justice Lobis's April 23, 1992 opinion decided many of the issues the parties attempted to bring before me. However, her opinion does not address Plaintiff's insolvency on the transfer date with more than a passing comment. "[D]efendants have presented no proof that [DSI] was, at the time of the sale of stock or currently, is in danger of becoming insolvent, to wit, unable to meet its debts as they become due." Op. at 7.[19] Indeed, Justice Lobis did find that Plaintiff was solvent on two other dates, the date of the sale, September 1, 1989, and the date of her opinion, April 23, 1992. On these issues, her evidentiary findings are persuasive and bear on my decision. Although DSI may have been solvent before and after September 17, 1991, it is their burden to show that it was insolvent on that date.

At trial, I heard testimony from Chester Borgida, who is a certified public accountant and partner at Grant Thornton, an accounting firm. Borgida testified that DSI hired Grant Thornton to audit its financial records as of August 31, 1991. He testified that the audit was done under his supervision and it followed generally accepted accounting standards and procedures.

Borgida said that Grant Thornton completed audited financial statements and submitted an opinion letter. Part of the opinion letter was a going concern opinion. He testified that Grant Thornton was of the view that DSI would not continue in business for another operating cycle. He also testified

that the balance sheet showed a net loss for the year of $4.5 million. On the witness stand, Borgida stated that it was his opinion that DSI, as of August 31, 1991, was having difficulty paying its creditors and did not have sufficient assets and income to pay its obligations.

Borgida's testimony on the insolvency issue was unpersuasive. First, he testified as to DSI's balance sheet as of August 31, 1991, not September 17, 1991. DSI offered no evidence that there had been no change of circumstances.

Borgida testified to conversations with Peltz and Drew Bernstein, who had prepared a separate accounting, regarding the audit. However, it appears that Peltz and Schulman gave Grant Thornton access to less than all of its records and information.

Borgida also testified that, in determining the financial condition of DSI measured, in terms of the sum of its debts in relation to the fair market value of its property, he used appraisals that were done approximately two years before the transfer date.

██ The appraisals were not offered in evidence, nor did DSI establish their reliability when done, or their validity when applied to its financial situation on September 17, 1991. The appraisals were part of the basis for Borgida's opinion. It is the burden of the proponent of an expert's opinion to prove that the underlying assumptions of the experts are true. *In re Joint Eastern and Southern District Asbestos Litigation,* 774 F.Supp. 113 (S.D.N.Y.1991), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir.1995). DSI has not met that burden.

It was incumbent upon DSI to prove that on September 17, 1991, which was between the two dates that Justice Lobis, by her test, found them to be solvent, the financial situation changed so that DSI became insolvent. They have failed to do so.

### D. Did DSI Receive Less than a Reasonably Equivalent Value

██ Finally, DSI had the burden of proving that it received less than a reason-

---

**19.** It is important to note that the insolvency test that Justice Lobis used, whether DSI was able to meet its debts as they became due, is not the

insolvency test that is used under the Bankruptcy Code.

ably equivalent value for the transfer. Mrs. D'Urso admits that she paid nothing to DSI for the Lease when it was terminated.

On the issue of value, I received testimony from David Zaumeyer. Zaumeyer is a partner at BDO Seidman ("BDO"), an accounting firm, and a professor at Rutgers University. He is a Certified Public Accountant with a masters degree in marketing and quantitative methods. Zaumeyer testified to a background in business appraisals.

He attempted to establish the fair market value of the stores as operating assets, with an ability to earn income. He stated that he has conducted several hundred appraisals since 1981 in a variety of industries. However, the appraisal for DSI was the first time he had appraised a supermarket business.

Zaumeyer testified that he was originally contacted by Schulman in early spring of 1993 to prepare appraisals on the Fteley, Lefferts and Freeport Stores as of August 31, 1991. He testified that he prepared most of the preliminary analysis in the fall of 1993 and issued a report, after some editorial changes, in early 1994. The appraisal report was subsequently reissued in June 1995.

He said that Schulman provided him with audited financial statements for the periods ending August 31, 1990 and August 31, 1991. In addition, Schulman gave Zaumeyer a description of the stores' operations, some gross margin data, a copy of the Lease, a copy of the mortgage note and some real estate appraisal letters prepared by Helmsley–Spear. It would appear that DSI supplied less than all the information available.

In addition to the information Schulman provided, Zaumeyer testified that he looked at government publications prepared by the Department of Commerce, which provide macro and microeconomic statistics about various industries, and publications from other organizations which survey various businesses.

He testified to the standards of business appraisals that are generally used. Those standards require appraisers to collect relevant and available information regarding the subject business, that a variety of valuation methods be considered, that the selection of the appraisal method used be the most suitable to the business enterprise and that the

conclusions and more mechanical aspects of the appraisal process be subject to tests of reasonableness.

The purpose of this valuation was to form an opinion as to the enterprise value of each location. Zaumeyer testified that he was not attempting to assess the fair market sale value of the leasehold interest, nor was he attempting to value the transfer from DSI to Mrs. D'Urso.

Zaumeyer stated that there were assumptions and limiting conditions in the appraisal. One of the conditions was that he did not perform an independent verification of any of the information provided by DSI or in the government publications. He did conduct tests of reasonableness, but his appraisal report cannot be used to determine that the underlying information is true.

He testified to several observations. The first was that DSI's sales peaked during the January 31, 1988 through August 31, 1990 period. The second was that DSI's gross margin, which ranged between 26% and 28%, was higher than the industry average of 22%. However, he did not give a reason why either was so. He stated that the significance of the first observation was that it was important for him to know DSI's growth assumption. The significance of the second observation was that it gave him comfort in using the data.

Zaumeyer also testified that in terms of determining operating expenses, because actual figures were not provided by DSI, that he calculated a number using a percentage of sales. The percentage came from one of the outside reports.

Zaumeyer also testified that there were no separate financial statements prepared for the individual stores. Consequently, there were no statements of assets, liabilities, or equities. In addition, he testified that he asked Schulman for the inventory balances as of August 31, 1991. He was provided with a "last in first out" (LIFO) basis inventory, but not a perpetual inventory or actual physical inventory.

Zaumeyer stated that, to determine value, he searched the Nexis computer database for information on public companies so he could

have a basis of comparison. However, he did not find a company that could be used for that purpose.

Zaumeyer next testified to the methods he used in arriving at the valuation calculations. The first method was a discounted earnings, or an income, approach. This approach projects the operating income or other measures of cash flow over a selected period of time and then discounts the result to obtain present value.

The second method was the capitalized earnings approach, which is also an income approach. Rather than using projected operating income over a future period, this method calls for selecting operating results in a single time period, normally the year of valuation.

The third approach which was used was the private transactions approach, which uses a price to sales ratio.

With regard to all these methods, Zaumeyer testified that none of them involved simply looking at the Lease and attempting to determine the value. The purpose of the valuation was to value the earnings of a hypothetical operating business. However, Zaumeyer testified that he gave consideration to the issue of rent and the cost of using the property, in conducting his valuation.

He also testified that one of the assumptions he made in determining valuation was that the business being evaluated has an unlimited life. He stated that he did not consider the business he was valuing to have a year or less duration, although DSI's own accountant did not think the business could last another cycle. When asked whether he would have different results if the business had a termination date of September 17, 1991 he stated that his results would be different. He also testified that if, hypothetically, the Leases on the three stores terminated, this event would not do anything to the value of the operating asset. It would, he said, raise some practical concerns, but would not affect the underlying inherent business value. Operating a business as a practical matter, however, would be impossible.

It would appear that so long as Mrs. D'Urso did not open supermarkets in competition with DSI, there would be no loss of enterprise value as a result of the Lease termination. The Lease termination only prevented DSI from running the business in those three locations that were covered by the Lease. DSI had every opportunity to continue the business in other locations. However, by the time Mrs. D'Urso leased her stores, it was clear that DSI had long abandoned any thought of opening a supermarket in the areas involved.

Zaumeyer also testified to several valuation factors he applied to the discounted earnings method. One factor is an understanding of the business. Another is the history of the businesses' earnings or income. In addition, it is important to have an understanding of the markets in which it operates and whether they have viability. He did no market testing or evaluation.

Zaumeyer testified that in applying an earnings method, it is important to have a company that generates a profit and that another factor to be considered, although not in this case, would be the market price of stocks of similar companies. In addition, if at all possible, one would inquire whether there was any goodwill value, that is whether or not there are earnings beyond a reasonable expectation of return on investment. Zaumeyer stated that this is more important with a public company. The final factor to be considered, although not applicable to this case, is to examine how much of a particular business is being valued.

Zaumeyer testified that the three stores were valued separately, and not as one package. However, he stated that if the three stores were bound up by one lease, as they actually were, then this would change the valuation because he would not be dealing with the enterprise of three individual stores. Realistically, the only thing that would have happened is that the information would have been consolidated for the discounted earnings method and perhaps he would not have considered using other methods.

He also testified as to how income flow was determined. He used the individual gross sales data and the individual gross margin information which he had for each store. He was not given the actual operating expenses. In order to arrive at operating expenses, he applied a percentage, which he obtained from

one of the reports, to the gross sales and then subtracted that number from the gross margin to arrive at operating income. The operating income number was then projected out and discounted back to present value.

In projecting the operating income, Zaumeyer assumed that revenues would increase at 2% and everything else would be expressed as a percentage of sales. He then determined the discount rate, which he testified was the expected rate of return for a series of income flows related to a particular investment. He said that he tried to identify what rate of return would be appropriate for a particular investment.

Zaumeyer testified that he calculated discounted future earnings using a fair market value lease and discounted earnings using the current lease. The difference between the two was the cost of operating the real estate. The rent assumptions for the fair market value lease were predicated on the fact that the Lease had expired, so instead of using the actual rent, the rent was calculated as a percentage of sales.

Zaumeyer also explained the capital earnings approach. With that approach, a single year's operating income is selected and then capitalized or converted to a value at an appropriate capitalization rate. The same method he used to calculate discounted earnings was used to calculate the capitalization rate. The only difference between the two was the assumption of growth.

He also explained the industry valuation method. He testified that he asked whether there were any generally accepted methods of appraisals for supermarket stores. According to Schulman, there are two methods, one is ten times weekly sales plus inventory and equipment and the other is five times net income before depreciation and amortization. Zaumeyer testified that he independently checked these two methods.

He next testified to private transaction comparisons. He stated that the Institute of Business Appraisers collects information on the sale of private businesses and then this information is classified under standard industrial codes. He received information containing a calculation of the price to sales ratio for this particular industry. He then calculated the August price to sales ratio and applied it to the gross sales of the three stores. The gross sales numbers were given to him by Schulman.

Finally, once he had assessed all the different calculations using all the different valuation methods, he averaged the results and ultimately determined that the enterprise value of the three stores using the then current lease cost was $9.6 million and using the fair market rent cost the value was $9.8 million.

On cross examination Zaumeyer stated that the enterprise value is not tied so much to the lease but to the fact that a business is being run in that particular neighborhood. In essence, enterprise value goes with the neighborhood.

It is significant that the Zaumeyer opinion is based on industry standards and assumptions, rather than the available audit financial statements and data in the possession of and available to Schulman.[20] Indeed, he attempted to get information from both Schulman and Grant Thornton, without success. It falls to DSI to provide whatever information is needed to support the opinion of its expert.

One point that is significant in Zaumeyer's testimony is his opinion that a defaulted lease has no value. Both Borgida and McCauley testified that an above market lease has no value.

■ The lease here was a defaulted, above market lease. It had no value. For purposes of determining "reasonably equivalent value" under Section 548, a bankruptcy court must take the debtor's property interest as it finds it.... *BFP v. Resolution Trust Co.*, —— at ——, 114 S.Ct. at 1762. DSI could not transfer what it did not have. *Matter of Besing*, 981 F.2d 1488 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). Therefore, DSI did not receive less than a reasonably equivalent value.

20. Zaumeyer did not consider the fact that DSI's business had failed or how the stores compared to the others in the chain. He leaves me to speculate why these stores, with an enterprise value of almost $10 million, did not operate at a profit.

*E. DSI's Right to the Value of the Equipment and Inventory Left in the Leased Stores and Mrs. D'Urso Claim for Expenses*

DSI argues that it is entitled to a payment or credit for the inventory and fixtures left in the Leased Stores when they were returned to Mrs. D'Urso. Mrs. D'Urso claims she is owed amounts for unpaid rents, taxes and expenses on the Leased Properties. The parties have asked that I determine the amounts each is owed by the other.

**1. Equipment**

█ As to the value of the equipment, DSI presented testimony from Lester Lichtenstein, the Vice–President of Modern Supermarket Equipment, a company that sells supermarket equipment. He testified that he attended a vocational school where he received a certificate in refrigeration technology. After graduating from school, most of the work he did concerned servicing supermarket refrigeration and air-conditioning equipment.

In 1974, Lichtenstein started his own company, Rite Installation Company. The company began as a service and installation company and then went into sales. In 1990, the company merged with another company called Resnick Equipment, and gave up the installation and service end of the business, to focus on sales.

Lichtenstein testified that he did not have any formal training as an appraiser. However, he did testify that as part of his business, he evaluates customers' equipment.

In June or July of 1995, Lichtenstein was asked by DSI's attorneys to value DSI's equipment. The valuation was based on the list prepared by Daley–Hodkin. The list included all the major equipment in the three stores.

Lichtenstein opined on the value of the equipment to someone who wanted it in place. He testified that he had been in the Fteley Store in the early 90's and had been there one time after. In addition, he had visited the Lefferts Store on a sales call, but had never visited the Freeport Store.

After some difficulty, it was finally established that Lichtenstein's opinion was based on the following assumptions that: 1) the list that was given to him was a complete list of the equipment in the store, including, refrigeration equipment and the equipment in the motor room; 2) the equipment operated during the time the stores were open; and 3) DSI had a reasonable maintenance procedure and there was no observable physical damage on November 19, 1992. Eventually, he assumed that the equipment was in reasonable operating condition.

It was the Plaintiff's burden to prove the assumptions underlying Lichtenstein's opinion. *In re Joint Eastern and Southern District Asbestos Litigation,* 774 F.Supp. 113 (S.D.N.Y.1991), *rev'd on other grounds,* 52 F.3d 1124 (2d Cir.1995). In order to prove the first assumption, DSI relied on Morris Hodkin's testimony and his report.

DSI first offered Schulman's testimony that when the stores were in operation the machinery was regularly maintained to prove the second assumption. However, Schulman could not prove that assumption, since he had no first hand knowledge.

In order to further support the second assumption and prove the third assumption, DSI relied on the testimony of Martin Eidelstein, who, at the time the stores were closed, was DSI's Chief of Operations and was responsible for making sure that maintenance was done in the stores. Eidelstein testified that he joined DSI in 1989. Although he testified that he did not have any training as a refrigerator technician, plumber, mechanic or electrician. He did testify that he had substantial "hands on" experience.

As part of his responsibilities, Eidelstein testified that during 1992, he regularly visited all the stores in the DSI chain. With respect to the Lefferts Store, he testified he visited that store approximately three or four times a week. With respect to the Fteley and Freeport Stores, he testified that he visited each approximately twice a week.[21]

---

**21.** After hearing his testimony, one wonders if Eidelstein did such mundane things as eat and sleep. He testified to upwards of 50 store visits a week, over a large geographic area, in addition to his other duties.

During these visits, Eidelstein testified that he looked at the equipment, checked the temperature of the cases and checked the motor room, as well as the machinery. He further testified that whenever there was a problem with a refrigeration unit, he had a system where the store would "beep" him and then he would contact that store. The store would then call the refrigeration mechanic. He would then follow up with the mechanic and, if necessary, visit the store.

In June of 1992, Eidelstein testified that when DSI began to close its stores, he supervised the clean up of the stores. Between June 1992 and November 1992, Eidelstein testified that he visited the Fteley, Lefferts and Freeport Stores approximately two or three times a week. On his last visit to the stores in mid November 1992, he testified that he did not observe any damage to any of the stores.

Based on these assumptions, Lichtenstein testified that his valuation of that equipment would be $1,502,995. He said he was able to give an opinion regarding the value of the equipment based on the list submitted to him by DSI's attorneys, although, he did not actually inspect any of the equipment. This valuation was based on the stores being in turnkey condition, meaning that the next store operator could walk right in and start the business.

On cross-examination, Lichtenstein conceded that he did not inspect the equipment himself, and that he has no personal knowledge as to whether the assumptions upon which the valuation was based were true as of November 19, 1992, or whether any of the stores were in turnkey condition. Significantly, he testified that he would not purchase the equipment at the price that he set, on the information upon which he based his opinion.

On the issue of the value of the equipment, Mrs. D'Urso presented testimony from Ron Gilbert, who is the vice-president of Resnick Rite Equipment, Lichtenstein's company.[22] Generally, Gilbert's responsibilities in the company center on buying and selling equipment.

In 1993, Gilbert was asked by a contractor to submit a proposal on the value of the equipment at the Fteley Store, less the cost of cleaning up the equipment. Gilbert testified that he visited the store and inspected the equipment. He then submitted the proposal sometime after April 1993. Gilbert determined that the value of the equipment was $5,000, but it would cost $11,000 to remove the equipment. Ultimately, Mrs. D'Urso paid Gilbert $6,495 to take the equipment away.

This procedure was then repeated in the Freeport Store. Again Gilbert visited the store and inspected the equipment. He determined that the equipment had very little salvageable value and that he would charge Mrs. D'Urso $9,200 to remove the equipment.

Gilbert also testified that he was only asked to determine how much it would cost to clean out the stores. He was never asked to determine the in place value of the equipment.

Mrs. D'Urso also called Morris Hodkin of Daley–Hodkin. Daley–Hodkin is in the business of appraising personal and real property in a variety of industries. Hodkin has testified as an expert appraiser and liquidator in a variety of cases.

He was hired by Mrs. D'Urso in November of 1992 to appraise the inventory and equipment of the three stores. He testified that a Mr. Libros from his company physically visited the three locations, inspected the inventory and listed it in order to prepare an appraisal report. Although Hodkin did not actually visit the locations and inspect the inventory, he did assist in valuing it.

He opined on two levels, an auction value level and a fair market value level. Hodkin testified that the auction value for the equipment at the Fteley Store was $28,000, for the Lefferts Store the equipment had an auction value of $65,000 and at the Freeport Store the equipment had an auction value of $52,500. Hodkin also testified to the fair market value of the equipment and determined that

22. Gilbert was called as a witness by Mrs. D'Urso, while Lichtenstein was called by DSI. Each gave testimony as to the value of the equipment, albeit Lichtenstein gave an in place valuation, and Gilbert a salvage value.

the equipment at the Fteley Store had a value of $125,000, at the Lefferts Store the equipment had a value of $270,000 and at the Freeport Store, the equipment had a value of $225,000.

I gave Hodkin's testimony little weight for several reasons. First, Hodkin neither inspected the equipment nor inventory himself. He appeared to have little knowledge of the equipment or its condition. His demeanor on the witness stand and his manner of answering questions did not inspire confidence. Also, during his direct testimony, Hodkin was led by his attorney to the extent that, at times, it was difficult to tell who was testifying, the witness or the lawyer.

It was DSI's burden to prove the value of the equipment, and they have failed to do so. The only value that they proved was the value of the equipment that Mrs. D'Urso sold to David and Mark. Lisa testified that she negotiated a $117,000 price for the fixtures at the Lefferts Store, however, the brothers have never paid that amount. Initially, she asked for $325,000, a number she took from the Daley–Hodkin Report. She then lowered the number to $232,000 and then to $117,000. She allowed her brothers to take equipment, such as refrigerator cases, from the Freeport Store, but only charged them a $4,000 liquidation value, rather than in place value, even though she ultimately sold the Freeport Store to a supermarket operator. In addition, I also received testimony from Fuertes, who determined that most of the equipment at the Fteley store had no value, except for a baler machine and a safe for which he paid $4,000. Fuertes also testified that when he purchased the Freeport store, the $2 million sale price included the equipment, however that equipment was assigned a value of $25,000.

I am inclined to give DSI the value that was paid for the equipment, less the cost that was charged to Mrs. D'Urso for removal of the equipment at the Freeport and Fteley Stores. Therefore, DSI is entitled to $234,305 for the equipment.[23]

## 2. Inventory

With regard to the inventory, DSI presented deposition testimony from Errol Levine who is the President of Ace, which is in the business of evaluating inventory for the supermarket industry. Ace was hired by DSI to evaluate the inventory in the Freeport, Fteley and Lefferts Stores. Levine did not conduct the inventory himself but testified at his deposition that the manner in which the inventory is evaluated is that the number of items is multiplied by the selling price and only saleable merchandise is counted in the inventory.

Ace delivered a report to DSI on November 10, 1992. The report was of the typical form that Ace generates. He valued the inventory at the Freeport Store at $66,531.64, the Fteley Store at $32,270.63 and the Lefferts Store at $98,765.61. This, essentially, is the in place value in an operating store.

I give little weight to Levine's testimony, which is contradicted by Schulman who testified that DSI attempted to get White Rose, one of its suppliers, to remove as much of the inventory left in the stores after July 1992. Although White Rose was reluctant to remove the inventory, in August or September of 1992, it did remove some of it but left inventory that was essentially the dregs. In addition, DSI submitted photographs and a videotape of the stores. It appeared from those photos and tapes that much of the inventory consisted of large bags of rice. Certainly, a good deal of it was old. There is no reason to believe any of the inventory was marketable.

Mrs. D'Urso relied on the testimony of Hodkin to place an auction value level and a fair market value on the inventory. Hodkin testified that the auction value for the inventory was $1,500 at the Fteley Store, $6,000 at the Lefferts Store and $4,000 at the Freeport Store. In addition, he testified that the fair market value of the inventory, in place, was $5,000 at the Fteley Store, $17,500 at the

**23.** Although Mrs. D'Urso did not emphasize this point, it would appear that DSI had every opportunity to remove the equipment and inventory, but chose not to, even though it had access to the premises for more than a year after the Lease ended, and controlled the date it gave up physical possession of the stores. One wonders if DSI thought there was any substantial value in what it left.

Lefferts Store and $11,000 at the Freeport Store.

Although DSI has failed to make a prima facie case on the issue of the value of the inventory, I believe that the inventory has, at least, some auction value. Therefore, DSI is granted a value of $11,500, which is the conceded auction value of the inventory.

### 3. Mrs. D'Urso's Claim for Expenses

On the issue of the amounts owed to Mrs. D'Urso by DSI, Mrs. D'Urso presented testimony from Lisa.[24] Lisa testified that after September 1, 1991, her mother did not receive any rent payments from DSI, and after DSI filed for bankruptcy, Lisa prepared her mother's proof of claim. The rent based on the terms of the Lease was $845,000 per annum. In addition, there was a consumer price index increase which brought the entire amount due from September 1, 1991, to the date of the filing, on July 9, 1992, to $750,168 in pre-petition rent.

In addition, DSI was required to pay taxes and other so called other "impositions." this amount calculated for the pre-petition period came to $212,987. These calculations were explained in Mrs. D'Urso's Exhibit S, her proof of claim.

Although Lisa also calculated amounts owed post-petition to be approximately $292,393.80 in rent and $90,294.40 in impositions, all of these expenses were clearly incurred post-petition and therefore, are not being considered here.

Finally, Lisa testified that her mother incurred other types of expenses in connection with the Properties. On the Fteley Property, she spent $70,815.94, including protection, repairs, maintenance, utilities and insurance. In addition, approximately $144,642.54 was incurred in relation to the Freeport Property. This number included the same expense items for Fteley plus the rent for the leased parking lot. Approximately $37,013.42 in expenses was incurred for the Lefferts Property. Some of these expenses, such as telephone bills, were not direct costs. In addition, it was not clear why and how these costs were incurred, and if DSI was liable for them. On cross examination, it appeared that some of the

expenses that were characterized as pre-petition, or were incurred pre-petition, were actually paid post-petition. In addition, even though the family had decided in November of 1993 that Mark and David would take over the Lefferts Property, and it was taken off the market, Mrs. D'Urso was seeking to recover expenses incurred until the brothers actually started to pay rent in April 1993.

Therefore, based on the testimony, Mrs. D'Urso is granted $963,155 on her pre-petition claim.

## IV. DECISION

Based on the foregoing, DSI's claim for judgment on the first, second, third causes of action is denied. On the fourth cause of action, DSI is entitled to $234,305 for the value of the equipment and $11,500 for the value of the inventory.

On her counterclaim for pre-petition amounts owed by DSI, Mrs. D'Urso is entitled to $963,155.

Parties are directed to settle an order.

24. Although Mrs. D'Urso has asked this court to determine the amounts owed her both pre and post-petition, I am only determining Mrs. D'Urso's pre-petition claim.